**BANCAMERICA COMMERCIAL CORPORATION and ASARCO Incorporated, Plaintiffs,**

v.

**TRINITY INDUSTRIES, INC. and Mosher Steel Company, Defendants.**

Civ. A. No. 90–2325–GTV.

United States District Court, D. Kansas.

Aug. 2, 1995.

Jane Harris Aniel, Bank of America National Trust, Los Angeles, CA, Christopher R. Hedican, Berens & Tate, P.C., Omaha, NE, Elizabeth Drill Nay, Thomas M. Martin, Lewis, Rice & Fingersh, Kansas City, MO, John M. Duggan, Duggan & Shadwick, P.C., Kansas City, MO, for Bancamerica Commercial Corp., plaintiff.

Roger D. Stanton, Stinson, Mag & Fizzell, Overland Park, KS, Robert L. Driscoll, Stinson, Mag & Fizzell, Kansas City, MO, Fred-

erick W. Addison, III, Bruce K. Packard, Elizabeth E. Mack, Locke, Purnell, Rain & Harrell, Dallas, TX, for Mosher Steel of Kansas, Inc. and Trinity Industries, Inc., defendants.

Steven B. Moore, Watson & Marshall L.C., Olathe, KS, Ilona L. Dotterrer, Bradley, Campbell, Carney and Madsen, Golden, CO, Katharine R. Stollman, Robert E. Zimet, Daniel H. Squire, Jerry Jackson, John Amodeo, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, Robert B. Best, Jr., Watson & Marshall L.C., Kansas City, MO, for AS-ARCO, Inc., plaintiff.

## TABLE OF CONTENTS

INTRODUCTION AND BACKGROUND ........................................1435
FINDINGS OF FACT ....................................................1435
 I. The Parties ....................................................1435
 II. The Site ......................................................1436
 III. Activities at the Site ........................................1437
 A. ASARCO ..................................................1437
 B. KCSS I..................................................1437
 C. KCSS II.................................................1437
 D. Trinity/Mosher..........................................1438
 E. BACC ...................................................1441
 IV. The Contamination and Cleanup .................................1442
 A. The Initial Investigation and Response ..................1442
 B. EPA Negotiations, Orders, and Actions ..................1443
 C. BACC's Cleanup Activities...............................1445
 D. ASARCO's Cleanup Activities ............................1445
 V. Cleanup Costs .................................................1446
 A. BACC ...................................................1446
 B. ASARCO .................................................1448
 VI. Sources of Contamination ......................................1448
 A. Barrels .................................................1448
 B. Asbestos ...............................................1448
 C. Lead ...................................................1449
CONCLUSIONS OF LAW .................................................1450
 I. CERCLA Claims .................................................1450
 A. Nature of the Action—Cost Recovery vs. Contribution ....1450
 B. Liability of Trinity and Mosher Steel ...................1450
 1. Consistency with the National Contingency Plan ...1451
 2. Trinity and Mosher Steel as Responsible Parties ..1454
 a. Trinity and Mosher Steel as Operators.........1454
 b. Hazardous Substance Disposal .................1455
 C. BACC's Liability .......................................1455
 D. Response Costs .........................................1458
 1. BACC's Response Costs ............................1458
 a. Barrel Removal ...............................1459
 b. Underground Storage Tank Remediation .........1461
 c. Asbestos Remediation..........................1462
 d. Lead Removal .................................1463
 e. Guard Costs ..................................1463
 f. Attorney Fees and Expenses ...................1463
 g. EPA Oversight Costs ..........................1466
 2. ASARCO's Response Costs ..........................1467
 a. Lead Removal .................................1467
 b. Attorney Fees ................................1468
 3. Prejudgment Interest.............................1469
 4. Summary—Response Costs...........................1470
 E. Apportionment and Allocation ..........................1470
 1. Apportionment of Harm ...........................1470
 2. Allocation of Costs .............................1472
 3. Allocating Specific Costs .......................1474
 a. Barrel Removal ...............................1474
 b. Security Guards ..............................1475

 c. Lead Removal .......................................... 1475
 d. Attorney Fees ......................................... 1475
 F. Summary—CERCLA Liability and Allocation of Costs ................... 1475
II. Indemnification ............................................. 1475
III. Breach of Contract .......................................... 1477
 A. Condition of Premises ..................................... 1477
 B. Diminution in Value ...................................... 1478
 C. Property Taxes ........................................... 1479
 D. Attorney Fees ........................................... 1480
 E. Summary—Breach of Contract Claims ............................. 1481
CONCLUSION ................................................. 1481
Appendix A: BACC Attorney Fee Response Costs Adjustments ................... 1482
Appendix B: BACC Attorney Fee Response Costs Summary ....................... 1487
Appendix C: ASARCO Attorney Fee Response Costs Adjustments ................ 1488

---

## MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

### INTRODUCTION AND BACKGROUND

This action involves the environmental cleanup of a 27–acre industrial site located at 2100 Metropolitan Avenue in Kansas City, Kansas (the "Site"). Plaintiffs Bancamerica Commercial Corporation ("BACC") and AS-ARCO Incorporated ("ASARCO") seek to hold defendants Trinity Industries, Inc. ("Trinity") and Mosher Steel Company ("Mosher Steel") liable under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, as amended, for costs incurred by the plaintiffs in response to a release of hazardous substances at the Site. BACC is the current owner of the Site and ASARCO is the successor corporation to a company that operated one of the largest lead smelters in the country at the Site in the 1890s. Trinity and Mosher Steel operated a structural steel fabrication facility at the site during the 1980s. In addition to the CERCLA claims, BACC also asserts pendent state law claims against Trinity for indemnification and breach of contract. Trinity has asserted an indemnity counterclaim against BACC.

BACC began this suit by bringing a CERCLA action against Trinity and Mosher Steel on September 14, 1990. Trinity and Mosher Steel impleaded ASARCO as a third party defendant on December 31, 1990, and BACC added ASARCO as a defendant on July 9, 1991. ASARCO filed counterclaims against BACC, Trinity, and Mosher Steel. BACC also added three individual defendants who had been officers and directors of Kansas City Structural Steel, a company that operated at the Site from 1907 until 1982. The individual defendants entered into settlement agreements and are no longer part of this suit. BACC and ASARCO also settled the claims between themselves, and ASARCO was realigned as a party plaintiff.

The court denied a number of summary judgment motions, and no substantive issues were resolved prior to trial. A trial to the court was held over 17 days during the period January 18 to April 15, 1994. After the United States Supreme Court issued a ruling in June 1994 regarding the treatment of attorney fees as CERCLA response costs, the court reopened the record and the parties returned to present additional testimony and evidence on September 22, 1994.

All parties have submitted proposed findings of fact and conclusions of law, in addition to a variety of other trial and post-trial briefs. The court has considered the testimony, evidence, and arguments of the parties. Pursuant to Fed.R.Civ.P. 52(a), the court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT [1]

#### I. The Parties

1. Plaintiff BACC, a Pennsylvania corporation, is the current owner of the property which is the focus of this litigation.

---

1. Many of the Findings of Fact are supported with references to testimony or documentary evidence or both. Such citations are not meant to be exhaustive authority for the finding. Some of the findings are based upon the record or inferences from the record which are not specifically cited.

Testimony of witnesses will be cited as follows: (*surname of witness, page number of trial transcript or deposition: line numbers*).

2. Plaintiff ASARCO operated a smelter at the property from 1899 until 1901 through a subsidiary, Consolidated Kansas City Smelting and Refining Company ("Consolidated"). (Exh. 750, 752, 754, 758.) In 1899 ASARCO purchased the assets of Consolidated which had operated the smelter from 1880 until 1899. (Exh. 650, 739, 742.)

3. Defendant Trinity, a Texas corporation, operated a structural steel plant at the property from 1985 until 1987. During 1984 and 1985, the structural steel plant was run by a wholly owned subsidiary of Trinity.

4. Defendant Mosher Steel is a separate subsidiary of Trinity.

5. ASARCO, BACC, Trinity, and Mosher Steel are all "persons" as that term is used in CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2).

6. Mosher Steel of Kansas, Inc. ("Mosher Kansas") was a Texas corporation incorporated on October 25, 1984 and dissolved on December 18, 1985. (Stipulation Nos. 4, 6.) During this period Mosher Kansas operated a structural steel plant on the site in question. Upon dissolution, Mosher Kansas distributed all its assets to Trinity, its sole shareholder. Mosher Kansas was dismissed as a defendant in this action by an order dated August 13, 1993.

7. Kansas City Structural Steel Company, a Missouri corporation ("KCSS I"), operated a structural steel plant at the site from 1907 until 1982. (Stipulation Nos. 1, 2.) KCSS I was dissolved and liquidated shortly after it ceased operations. KCSS I was not subject to suit because of its dissolved status, and was not named as a party to this action. Certain directors and officers of KCSS I were, however, named as defendants. Those defendants are John S. Harrow (now deceased and represented by James E. Harrow), Thomas M. Fitch, and James E. Harrow. Because a settlement between these individual defendants and the plaintiffs was pending, these defendants did not participate in the trial. By an order entered on July 5, 1994, the court approved the settlement agreement and dismissed with prejudice all claims against the individual defendants.

8. John S. Harrow became general manager of KCSS I in 1960, and president in 1962. He served as president until 1975 when he became chief executive officer. He also served on KCSS I's board of directors from 1958 until his resignation in 1981. Mr. Harrow died on May 1, 1993, and James E. Harrow was appointed personal representative of the estate.

9. Thomas Fitch began his employment with KCSS I in 1959 as a senior management executive. He became executive vice president in 1962 and later became president and chief operating officer in 1975. He also served on the board of directors beginning in 1960.

10. James E. Harrow began employment with KCSS I in 1972 and was named vice president in 1976. He served as an officer until KCSS I was sold in 1982.

## II. The Site

11. This litigation is focused on environmental contamination and cleanup of a 27-acre industrial site located at 2100 Metropolitan Avenue in Kansas City, Kansas (the "Site").

12. The Site is a "facility" as defined by CERCLA § 101(9), 42 U.S.C. § 9601(9).

13. The Site lies within the Kansas River floodplain and is located within 600 feet of the river. Residential areas border the Site to the south and west, an expressway runs to the east of the Site, and a Santa Fe railroad yard is to the north.

14. At one time, the Site included open-air work yards with overhead crane structures, a railroad spur, and several separate structures. The buildings were demolished as part of the environmental cleanup activities. Most of the buildings were of steel and metal construction with either dirt or concrete floors. One building was a brick warehouse that had been constructed in the 1890s. One area outside the buildings consisted of a concrete slab with crane rails overhead which

was used for storing steel members prior to fabrication. (Kaiser, 53:16–54:14.)

15. A 7–acre portion of the property which contains an office building is situated at a higher elevation than the rest and was unaffected by the contamination. Tobin Construction Company leased this building for office space from May 1986 to December 1988. BACC subdivided the property and offered this portion for sale as a separate parcel. (Kaiser, 87:3–23.) This upper parcel was not included in any cleanup activities.

### III. Activities at the Site

#### A. ASARCO

16. In 1881 Consolidated Kansas City Smelting and Refining began smelting and refining operations at the Site. In 1899 AS-ARCO purchased Consolidated's capital stock (Exh. 650, 739, 742), and the smelting operations continued at the Site until 1902 when the smelter was shut down (Exh. 750, 752, 754, 758).

17. At the time, this was one of the largest lead smelters in the world. (Exh. 745.) In its peak year (1898), the smelter produced one-fifth of the lead produced in the United States; one-eighth of all the silver; and one-twelfth of all gold. (Exh. 131 at 11; Exh. 797.)

18. The smelting operation resulted in tons of lead being disposed of at the Site. (Exh. 638 at 66–67; Exh. 131 at 11; Exh. 28 at 7.) This lead took the form of slag and smelter ash. In 1908, after KCSS I took over the Site, workers found deposits of "gold, silver, lead and other metals" left in the ground by ASARCO's operations. The workers found a twenty-ton deposit of lead which apparently had leaked through the floor of an old blast furnace and was covered when a new floor was laid. This was refined and smelted for gold, silver, and lead. In 1929, the interior of the large smelter stack was cleaned and the soot refined for precious metals. (Exh. 638 at 66–67.)

#### B. KCSS I

19. After ASARCO closed the smelter in 1902, the Site was not in use until 1907 when it was purchased by KCSS I. KCSS I owned and operated a steel fabrication facility at the Site from 1907 until 1982.

20. KCSS I primarily used the Site for its steel fabrication business which involved fabrication of highway bridges and girders under various state and federal highway contracts. In connection with this work KCSS I painted structural steel on the Site. During this period, many government contracts required that lead-based solvents and paints be used on the steel bridges and girders. KCSS I followed the specifications and used lead-based solvents, primer paints, and final coat paints. (Kenney, 2311–2329; Exh. 781; John S. Harrow deposition, 23:16–25, 43:2–8; Meiners deposition, 204:23–205:16; Manahan deposition, 45:16–24; James E. Harrow deposition, 79:15–20, 80:3–4, 8–10.)

21. Lead paint was used on a significant proportion of the projects. During the period 1954 to 1969, KCSS I completed over 200 projects that used lead based paint. (Exh. 781.) KCSS I also used lead-based paint prior to 1954 and after 1969. (Kenney, 2336:22–2337:9; James E. Harrow deposition, 80:3–4, 8–10.)

22. KCSS I's painting was performed primarily at one building on the Site but painting also occurred from time to time throughout the Site. When steel structures were painted, paint overspray and drippings came to rest on walls, buildings, and exposed soil. Paint overspray congealed and formed spherical objects referred to as "paint balls" (Kenney, 603:6–9; Niemeyer, 369:1–14; Walker, 1546:3–11) which contain elevated levels of lead (Walker, 1548:19–1549:21).

#### C. KCSS II

23. In 1982 Kansas City Structural Steel Company of Kansas ("KCSS II") acquired the Site and assets of KCSS I in a leveraged buyout by KCSS I management. At the same time, BACC entered into a Loan and Security Agreement with KCSS II under which BACC could advance up to $4.5 million in working capital to KCSS II based upon a formula contained in the agreement.

24. Robert Kenney was the plant manager of KCSS II from 1982 to 1984. He had previously worked at the plant for KCSS I from 1973 to 1982. Mr. Kenney also was the plant manager for Mosher Steel from 1984 to 1985. Mr. Kenney testified that while he

was plant manager for KCSS II, the paint balls around the Site were cleaned up every four to six months. (Kenney, 625:5–11.) In 1984, when the work was very slow and KCSS II was winding down, Mr. Kenney ordered his crews to clean up all paint balls left in the paint bays and contiguous shop areas. (Kenney, 624:13–625:16; 661:16–662:14.)

25. KCSS II operated at the Site until BACC accepted the deed in lieu of foreclosure from KCSS II on October 26, 1984. (Stipulation No. 3.)

### D. Trinity/Mosher

26. BACC leased the Site to Mosher Kansas pursuant to a Commercial and Industrial Lease dated October 26, 1984. BACC also sold to Mosher Kansas all the equipment, machinery, and inventory which it had acquired from KCSS II. (Exh. 116, 117.)

27. Under the terms of the lease agreement, Mosher Kansas was responsible for paying all taxes, insurance, expenses, maintenance, and assessments associated with the Site.

28. Under the lease, Mosher Kansas acknowledged that it had inspected the premises and accepted the Site in its then-present condition. Mosher Kansas also agreed to take good care of the premises and fixtures and, at the expiration of the lease term, to surrender the premises in as good condition as when received, except for reasonable wear and tear. Mosher Kansas agreed to repair all damage to the premises not caused by fire or other casualty. Mosher Kansas further agreed to comply with all laws affecting the premises and to hold BACC harmless from expense or damage resulting from failure to do so.

29. Also on October 26, 1994, BACC, Mosher Kansas, and Trinity entered into an agreement of representations, indemnity and guaranty. (Exh. 118.) Under this agreement, BACC is required to indemnify and hold harmless Trinity and Mosher Kansas from any loss or liability resulting from:

> Any claim or demand asserted against Mosher [Kansas] in which it is alleged that Mosher [Kansas] is a transferee or successor to Kansas City Structural Steel Company [KCSS II] or BACC.

or resulting from:

> All liens or claims for lien or other liabilities existing as of the date hereof which are subsequently asserted against any of the assets transferred to Mosher [Kansas] under the Bill of Sale or leased to Mosher [Kansas] under the Lease or against Buyer.

30. By letter dated May 19, 1992, after this litigation began, Trinity demanded that BACC's claims against Trinity and Mosher Steel be dismissed on the grounds that BACC had indemnified Trinity against all liability related to Trinity's lease of the Site, including liability for removal of lead on the Site which existed prior to the date of the indemnity agreement. (Exh. 802.)

31. Mosher Kansas was not a successor to KCSS II. Neither Mosher Kansas nor Trinity assumed the liabilities of KCSS II. Mosher Kansas had the right to select what work in progress it would complete. (Phelps, 2155:1–12, Echternach, 1442:7–21; Exh. 166.) The purchase of assets from KCSS II was structured so that Mosher Kansas would not be considered a successor to KCSS II. (Phelps, 2156:4–20.)

32. As part of the October 26, 1984 transaction, BACC sold to Mosher Kansas all equipment and machinery which BACC had acquired from KCSS II, including overhead cranes. In consideration for these and other assets, Mosher Kansas issued to BACC a negotiable promissory note in the principal amount of $910,000.00.

33. Although Mosher Kansas was created in 1984 to operate the structural steel plant, Trinity and Mosher Steel were in actual control of the operations.

34. Trinity and Mosher Steel officials directed the Kansas City plant's operations from Dallas (Trinity's headquarters) and Houston (Mosher Steel's headquarters), and Kansas City plant management reported directly to those officials. (Phelps, 2155:22–24.) Trinity and Mosher Steel also had management on-site at the Kansas City plant. (Phelps, 2155:18–22.)

35. Trinity's Safety and Environmental Director monitored safety and compliance matters for the Kansas City plant, including the storage of hazardous materials and industrial waste. (Riddles, 2169:7–2170:7, 2181:13–2182:9.)

36. Mosher Steel officials dictated personnel matters for the Kansas City plant, including the firing and replacement of the plant manager. (Peters deposition dated 7/17/92, 19:10–12; Stewart deposition dated 8/5/92, 27:10–23.) Mosher Steel also controlled purchasing, plant layout, sales, and engineering for the Kansas City plant. (Benton deposition dated 10/22/91, 32:1–21, 48:7–22, 50:6–12, 51:7–17.)

37. Mosher Kansas was dissolved on December 18, 1985 (Stipulation No. 6.), and all its assets were distributed to Trinity, its sole shareholder. At that time, Trinity agreed to complete all work of Mosher Kansas in progress. (Phelps, 2156:21–2157:2.) Mosher Kansas assigned its lease to Trinity. No change in personnel or operations occurred upon the dissolution of Mosher Kansas. (Phelps, 2157:3–6.) Trinity agreed to pay the creditors of Mosher Kansas and also took assignment of the lease with BACC. (Phelps deposition dated 10/21/91, 216:19–217:1; Exh. 118, 153.)

38. Mosher Steel and Trinity assumed all significant work in progress from KCSS II. (Kenney, 2445:1–2.) In addition, work was transferred to the Kansas City plant from Trinity operations located in other parts of the United States. (Kenney 648:23–649:1.) The plant grew in size from 30 employees to 180 employees, and by 1985 Mosher Steel and Trinity produced about the same tonnage of steel as KCSS I had produced in its peak period in the late 1970s and early 1980s. (Kenney, 2444:1–18.)

39. Mosher Steel and Trinity used lead-based paint at the Site from 1984 to 1987. The majority of work performed at the Site during this period was bridge fabrication which usually required the use of lead-based paints and thinners. (Kenney, 608:13–609:25, 611:11–15, 613:20–25, 614:1–4, 618:9–22, 619:3–25, 620:20–624:5, 2431:24–2432:21.) Painting was performed both within and outside Buildings 1 and 4. (Kenney, 601:20–603:3; Niemeyer, 383:8–384:14.) Mosher Steel and Trinity used airless spray nozzles to apply paint. This method necessarily resulted in some overspray. (Kenney, 599:13–24, 603:10–16, 655:18–656:3; Walker, 1611:1–4.) Paint overspray routinely landed on the ground and often created paint balls. (Kenney, 603:10–25, 655:18–656:3.) Trinity and Mosher Steel also used chromium and zinc-based paint at the Site during this period. (Kenney, 601:20–603:25, 608:13–610:5, 613:11–614:4, 618:9–13, 621:12–18, 639:14–17.)

40. Hazardous materials were generated at Trinity's plants, including the Kansas City plant. (Niemeyer, 367:21–368:23; Riddles, 2207:15–19.) The hazardous materials were identified in Trinity's Industrial Hazardous Waste Management Program and Operations Manual. (Exh. 155.) Trinity's policy required that Material Safety Data Sheets ("MSDS") be kept for each hazardous substance purchased for use at the Site, as required by the federal Occupational Health and Safety Act. MSDSes were kept for all paints used and were to be made available to employees. (Niemeyer, 335:10–336:19, 338:13–22.)

41. Underground storage tanks were present when Trinity leased the Site from BACC. Trinity used one of the tanks containing gasoline for a short period of time after commencing operations at the Site. (Kenney, 652:21–653:1, 660:18–661:4.)

42. The Kansas City plant was not operating profitably and, after reviewing various options, Trinity decided that it would shut down the operation. (Phelps, 2128:1–19.)

43. On December 4, 1986, BACC and Trinity entered into a lease cancellation agreement in which the parties agreed to cancel the lease effective March 1, 1987. (Exh. 153.)

44. Trinity ceased operations at the Site in February 1987 and engaged in plant closure activities from February through May 1987. (Langford, 2049:17–25.) During this period, Trinity performed general cleanup and hired a contractor to remove trash from the Site. (Langford, 2069:5–10, 2085:16–2087:8.) Trinity also hired a scrap dealer to haul off small pieces of steel which could not

be used at other Trinity plants. (Langford, 2054:22–2055:4.)

45. Trinity disassembled various pieces of equipment, including mobile cranes, forklifts, wire feeders, and a wheelabrator, and shipped the equipment to maintenance facilities in Dallas and Houston, and to other structural steel plants. (Langford, 2056:2–2057:2.)

46. Trinity also gathered up various liquid products, such as, paint, paint thinner, hydraulic fluid, and oils, and shipped those products to its maintenance facility. (Langford, 2070:3–2075:6.) Some of the material from the Kansas City plant was later shipped out of the maintenance facility and treated as hazardous waste. (Riddles, 2208:22–25.) No hazardous waste manifests were completed in connection with the material shipped from the Kansas City plant. (Langford, 2110:14–16.)

47. Three concrete pits were left open after machinery had been removed. Trinity arranged for Tobin Construction Company to fill those pits with material called "crush and run" which is crushed limestone. (Langford, 2078:23–2080:21.)

48. At the same time, a number of barrels were also buried in one of those pits. (Langford, 2082:20–24.) It was later discovered that over 80 barrels had been buried in the pit. (Skach, 279:15–280:5; Exh. 33.)

49. In addition to the barrels that had been buried, Trinity also left over 200 55–gallon barrels at various locations around the Site. (Langford, 2090:4–10.) For the most part, the barrels had been used for trash, but some of the barrels contained small amounts of hazardous materials.

50. At BACC's request, Trinity left cranes and compressors at the Site. (Stipulation No. 12; Langford, 2053:1–13.) Trinity agreed that the compressors were fixtures and therefore not part of Trinity's assets. (Phelps, 2134:22–2135:21.)

51. When Trinity left the Site, the compressors, which hold 3–12 barrels of oil each, were fully operational and had oil in them. (Langford, 2064:1–2065:5, 2099:23–2100:5; Serrone, 2473:20–22.) The compressors were later removed, and some oil may have spilled in the process. (Langford 2101:8–2102:20.)

52. As part of the Lease Cancellation Agreement, Trinity granted to BACC the option to purchase the overhead cranes and crane ways located on the Site. On March 1, 1987, BACC and Trinity entered into an Agreement and Bill of Sale in which BACC agreed to purchase from Trinity some of the overhead cranes and crane ways. (Exh. 832.) BACC agreed to pay to Trinity $200,000.00 on March 1, 1989, or earlier if BACC should sell or otherwise convey the real property. The agreement provided that if BACC failed to pay the amounts due, then Trinity could elect to offset any amount due against any payments of principal or interest on the $910,000.00 note issued to BACC in October 1984 in exchange for the assets that BACC sold to Mosher Kansas. Trinity's vice-president testified by deposition that BACC failed to pay the amount due for purchase of the cranes. (Phelps depo., vol. 1, 120:10–121:11, 123:11–124:6.) There is, however, no other evidence of default by BACC in connection with the March 1, 1987 Agreement and Bill of Sale.

53. As part of the March 1, 1987 agreement, BACC also agreed to assume Trinity's interest in a lease agreement entered into between Trinity and J.A. Tobin Construction Company dated May 1, 1986. (Exh. 832.) Trinity had sub-leased the upper portion of the Site to the construction company. (Phelps, 2133:21–24.) In assuming the lease, BACC also agreed to perform Trinity's obligations under the lease and to indemnify Trinity against possible liability or loss related to the lease.

54. Trinity completed its plant closure and left the Site in May 1987. (Langford, 2091:21–23.)

55. After Trinity left the Site, BACC complained to Trinity about the condition of the Site. (Phelps, 2137:1–4.) Trinity directed Gregg Langford, its employee who had coordinated the plant closure activities, to return to the Site in June 1987. (Langford, 2092:11–2093:6.) Scrap material had been left at the Site and the office buildings had been vandalized. (Langford, 2093:7–19; Phelps, 2137:14–24.)

56. During this second cleanup, Trinity hired a scrap metal dealer to remove the

remaining structural steel, cleaned up some of the trash remaining on the Site, disposed of the remaining office furniture, and moved the barrels to various staging locations on the Site. (Langford, 2096:1–2098:5.) These cleanup activities lasted for about one month, and Trinity left the Site for the second time in July 1987.

57. At the end of the second cleanup, Mr. Louis Serrone, the real estate agent hired by BACC, told Trinity representatives that the Site had been cleaned up to his satisfaction. Mr. Serrone also walked through the Site with Mr. Langford at the end of the second cleanup and did not identify any remaining problems. (Phelps, 2138:19–2139:13; Langford, 2098:6–2099:22.) Mr. Serrone testified that no walk-through occurred and that he never approved the condition of the Site. (Serrone, 2469:14–16, 2470:19–2471:14.) The court find's Mr. Serrone's testimony on this point to be not credible.

58. Trinity received no further communication from BACC regarding the condition of the Site until January 1989 when BACC sent a letter to Trinity requesting payment for environmental testing work related to the barrels left at the Site. (Phelps, 2139:22–2140:17; Exh. 15.)

59. On April 30, 1990, BACC made a demand that Trinity pay real estate taxes due on the Site for 1986 and 1987. (Transcript, 562:20–563:1.) In June 1990, BACC paid the real estate taxes due to Wyandotte County, Kansas. The taxes paid totalled $59,466.91 for 1986 and $64,206.94 for 1987. (Exh. 210.) Trinity did not reimburse BACC for the payment of the 1986 and 1987 taxes. (Rotticci, 1860:24–1861:1.)

### E. BACC

60. BACC's involvement at the Site began in 1982 when it entered into a Loan and Security Agreement with KCSS II.

61. Under the loan agreement, BACC took a security interest in the accounts receivable, inventory, machinery, equipment, and real estate. The agreement provided a formula to determine the maximum amount that KCSS II could borrow at any one time. The agreement gave BACC certain rights which included receipt of periodic financial statements, the ability to inspect the invento-

ry on the premises, and the option to notify KCSS II's customers to send remittances directly to BACC. The loan agreement also contained several "negative covenants" which restricted actions that KCSS II could take without BACC's approval. These negative covenants included restrictions on the following activities, among others: increases in executive compensation, material changes in management, creation of additional liens, material changes in the type of business, and purchase of fixed assets valued at more than $50,000.00. (Exh. 3; Echternach, 1410:9–1413:8.)

62. During the period that the loan agreement was in effect, BACC visited the Site and reviewed KCSS II's operations. The court heard conflicting testimony regarding the frequency of these visits and the extent of review.

63. Alfred San Martin, a former BACC senior credit loan officer responsible for monitoring the KCSS II loan, testified that he visited the Site to review accounts receivable and to analyze inventory and raw materials (San Martin, 673:4–674:3), that the visits never lasted for more than one day (San Martin, 675:3–13), and that the frequency of the visits in the beginning was once every two months and later increased as KCSS II's financial condition worsened (San Martin, 672:11–20). Mr. San Martin also testified that he never instructed KCSS II officials on whether to bid on or accept projects. (San Martin, 680:19–681:4.)

64. Harold Echternach, a former BACC senior account officer, had been responsible for monitoring the KCSS II loan prior to the appointment of Mr. San Martin, and was later Mr. San Martin's supervisor. Mr. Echternach testified that he made quarterly visits to the Site and that each visit lasted four to six hours. (Echternach, 1417:12–1418:3.) Mr. Echternach further testified that BACC did not control the KCSS II operations or restrict KCSS II projects, nor did BACC discuss environmental conditions at the Site with KCSS II officials. (Echternach, 1424:19–1425:3, 1434:10–20.)

65. James E. Harrow, who was president of KCSS II, testified by deposition that BACC ran KCSS II's operations and that

Mr. San Martin was present at the Site on a daily basis for a period shortly before KCSS II ceased operation. Mr. Harrow further testified that BACC required KCSS II to obtain BACC's approval before submitting bids on contracts, and that BACC did not allow KCSS II to bid on particular jobs that BACC deemed to be unworthy.

66. The court finds the testimony of Mr. San Martin and Mr. Echternach to be credible and accepts as true their version of the relationship between BACC and KCSS II.

67. In addition to the visits and reviews, BACC also instituted a lock box arrangement under which KCSS II customers sent remittances directly to a receiving bank for processing. The bank then forwarded the remittances to BACC. This type of arrangement was permitted by the loan agreement and is common in the commercial loan business. BACC implemented the arrangement only after it had evidence that KCSS II had been diverting some of its funds.

68. The loan and security agreement expired on May 15, 1983. BACC and KCSS II then agreed to continue the agreement through August 31, 1983. BACC continued to extend financing pending receipt of audited March 1983 financial statements. On November 11, 1983, BACC sent a letter to KCSS II notifying it that BACC agreed to continue financing through December 31, 1983, while KCSS II attempted to secure replacement financing. Ultimately, BACC extended financing to October 1984. (Exh. 109, 110, 111; Echternach, 1433:15–18.)

69. BACC gave formal notice of default under the loan and security agreement by a letter to KCSS II dated August 23, 1984. After receiving the notice of default, KCSS II continued to operate the business and continued to try to either sell the company or refinance the debt. (Echternach, 1433:19–1434:4.)

70. On October 26, 1984, BACC and KCSS II entered into a surrender in lieu of foreclosure agreement. Pursuant to that agreement, KCSS II transferred to BACC the real estate and personal property secured by the security agreements. At the time of the surrender, KCSS II owed over $4,000,000 to BACC. (Exh. 114.)

71. After the lease was entered into with Mosher Kansas, BACC listed the property for sale with commercial realtor B.A. Karbank. (Echternach, 1455:15–21, 1457:11–14.)

72. The lease with Mosher Kansas granted it an option to purchase the property at its fair market value after the 48th month of the lease term, as well as a right of first refusal if other offers to buy the property were made. (Exh. 117.)

73. After Trinity discontinued operations, BACC retained another commercial realtor, Mr. Louis Serrone of Cohen–Esrey, who actively tried to sell the property. The listing agreement with Mr. Serrone was in effect from March 9, 1987 through September 1988. BACC received four offers to purchase the property in April, May, and July, 1988, but BACC rejected them. The offers ranged in amount from $500,000 to $750,000. (Kaiser, 86:17–18; Serrone, 221:1–223:6, 225:22–226:13, 241:13–20.) After the contamination was found at the Site, BACC split off the non-contaminated upper portion of the property and has attempted to sell that portion. (Kaiser, 87:3–88:5.)

74. The City of Kansas City, Kansas, had issued industrial revenue bonds (IRBs) to finance certain capital improvements made by KCSS II. As a part of that transaction, the city took legal title to a portion of the Site as security for the bond debt. (Echternach, 1447:1–3.) BACC paid $896,849.48 on February 28, 1985, in order to retire the IRBs and obtain clear title to the entire Site. (Exh. 127.) Legal title of that portion of the Site was then transferred from the city to BACC.

IV. The Contamination and Cleanup

A. The Initial Investigation and Response

75. BACC hired Woodward Clyde Consultants to conduct an environmental site assessment at the Site in May 1988. (Skach, 254:10–255:7.) During the initial assessment, the Woodward Clyde team observed that soil was either wet or stained near a number of the barrels. Many of the barrels contained liquid material which could not readily be identified. According to Robert Skach, Woodward Clyde's project manager, the bar-

rels were the primary concern at the time. Soil was also found to be stained in other locations, and large deposits of slag were also observed. (Skach, 255:1–261:20.) As a result of the initial assessment, additional soil and groundwater samples were collected in and around the Site area. (Kaiser, 57:1–25.)

76. In July 1988, Woodward Clyde developed a program to inventory and sample the materials contained in all the barrels. A total of 272 barrels were inventoried and then separated into the following categories according to their contents: empty, trash materials only, and non-trash materials. The non-trash containers were further separated according to suspected contents into water, solvent, oils, and solids. Sampling results indicated that 222 barrels were empty or contained trash, 30 barrels contained petroleum products, and 20 barrels contained potentially hazardous compounds including solids, acids and caustics, and one drum of salvageable lead/acid batteries. (Exh. 28 at p. 68–71.)

77. Woodward Clyde observed that the barrels buried in the wheelabrator pit contained leaking material and that some liquid was present in the pit. Since the nature of the material was unknown, Woodward Clyde determined that the barrels should be removed and samples from the barrels should be tested. (Skach, 279:15–280:5.)

78. Woodward Clyde developed a health and safety plan which documented the precautions that would be taken in connection with barrel sampling and characterization activities. (Skach, 263:6–18.)

79. Woodward Clyde soil and groundwater testing detected lead present in surface soils at the Site at levels up to 45,100 parts per million (ppm) inside the buildings, and up to 12,000 ppm in exterior surface soils. Lead was also detected in unfiltered groundwater samples from the Site at levels up to 690 parts per billion (ppb). No lead was detected in filtered groundwater samples.

80. The Woodward Clyde study also detected chromium, zinc, iron, and arsenic in surface soils at the Site and barium, cadmium, chromium, zinc, and arsenic in unfiltered groundwater samples from the Site. Asbestos was also found in piles of refractory brick stored at the Site.

81. Lead is a hazardous substance as defined by CERCLA § 101(14), 42 U.S.C. § 9601(14). The lead found at the Site constituted an actual or threatened release of hazardous substances into the environment.

82. In August 1988, a contractor excavated and removed three underground storage tanks from the northwest corner of the Site. The tank contents, consisting solely of gasoline, were pumped into drums and removed from the Site along with the tanks. (Exh. 28 at p. 66.) Discolored or moist soils were observed in the material surrounding the tanks during removal. (Exh. 28, App. H.) Woodward Clyde collected soil samples from the bottom of each excavation pit. Testing revealed that petroleum hydrocarbons were present in the subsurface in the vicinity of the storage tank locations. The concentration of hydrocarbons in those locations exceeded the action level set by the Kansas Department of Health and Environment (KDHE). The underground storage tank remediation activities were conducted under KDHE's oversight.

83. BACC contracted for security guard service beginning in August 1988 after the testing by Woodward Clyde indicated that some barrels had been buried at the Site. BACC took this action in light of the uncertainty regarding possible contamination at the Site and the occurrences of vandalism. After BACC reported its findings, EPA advised BACC to continue the 24–hour guard service. (Kaiser, 60–61, 84–86, 118–122.)

**B. EPA Negotiations, Orders, and Actions**

84. After Woodward Clyde completed its initial investigation, BACC turned over to EPA the Woodward Clyde reports and information regarding other former Site owners and operators. (Kaiser, 60:9–25.)

85. During a conference on July 10, 1989, EPA gave oral notification to counsel for BACC, Trinity, and ASARCO, that the parties faced potential liability under CERCLA. EPA gave formal notification of potential liability to the parties by letter dated August 4, 1989. (Exh. 73.)

86. During a meeting on October 12, 1989, EPA indicated that it would continue negotiations only if the parties agreed to conduct work under an Administrative Consent Order drafted by EPA. (Exh. 22, 35.) Negotiations regarding a possible consent order between EPA and the three private parties continued into December 1989. (Exh. 37; Kaiser, 76:23–77:1.)

87. BACC and EPA entered into an Administrative Consent Order concerning the Site on February 7, 1990. (Exh. 95.) Trinity and ASARCO failed to reach agreement with the EPA regarding a consent order. The Administrative Consent Order required that BACC undertake a removal action to be performed in two separate phases.

88. Under the Administrative Consent Order, BACC agreed to prepare for EPA review a Removal Action Workplan Phase I (RAW I) which was to include: a stabilization/solidification treatability study workplan for addressing the contamination in the soil; a soil sampling and analysis plan to quantify the extent of contaminated soil requiring treatment; a container characterization, removal and disposal plan; information regarding the contamination associated with the underground storage tanks; a plan for continuous ambient air sampling; documentation regarding efforts to locate former fume tunnels and smoke stacks; a plan to install groundwater monitoring wells; quality assurance and health and safety plans; and, a plan for maintaining security at the Site during the removal action. The RAW I was to be implemented after EPA approval.

89. BACC also agreed in the Administrative Consent Order to submit additional studies for EPA approval, including a Removal Action Workplan Phase II (RAW II), according to the schedule set forth in the Administrative Consent Order. The RAW II was to include a plan for the stabilization/solidification of surface fill material containing concentrations of lead at 1,000 ppm or greater and placement of a protective cover over areas containing treated fill material, and a plan to extend the cover over the exposed existing solidified slag deposit. The RAW II was to be implemented after EPA approval.

90. The stabilization/solidification process is the physical and chemical binding of lead-containing fill material so that it is not available for contact or off-site migration.

91. BACC also agreed to reimburse EPA for all response and oversight costs incurred by EPA in connection with the Site.

92. EPA agreed in the Administrative Consent Order that the work to be performed, if properly performed, would be consistent with the provisions of the National Contingency Plan ("NCP"), 40 C.F.R. Part 300, pursuant to 42 U.S.C. § 9605, as well as with the provisions of 42 U.S.C. § 9621. The Administrative Consent Order also required that all actions taken pursuant to the terms of the order should be undertaken in accordance with the requirements of all applicable local, state, and federal laws and regulations.

93. On September 3, 1991, BACC notified EPA that based on proposed regulations regarding a CERCLA provision exempting from CERCLA liability secured lenders who take title to property to protect their security interests, BACC did not believe it was obligated to continue cleanup of the Site. (Exh. 86.) BACC discontinued its cleanup work at the Site. EPA did not attempt to enforce the Administrative Consent Order, but instead proposed a modified consent order to which BACC did not agree. (Kaiser, 95:5–96:13.)

94. On December 12, 1991, EPA issued a Unilateral CERCLA § 106 Order ("106 Order" or "Unilateral Order") to ASARCO, requiring it to work with BACC in completing the cleanup actions and to perform specific response actions for lead at the Site. The 106 Order was modified on December 15, 1992. (Exh. 38.)

95. The modified 106 Order requires either stabilization and solidification or onsite landfilling of material that exceeds 500 ppm lead in the zero to two foot depth range and 1,000 ppm lead in the two to four foot depth range. In connection with the onsite landfill, the order requires that ASARCO include in its landfill design "all local, state and federal landfill requirements including, but not limited to, ... the Kansas Solid Waste Statute, Kan.Stat.Ann. § 65–34 (1991), and the Kansas Solid Waste Management Regulations, Kan.Admin.Regs. § 29 (1991)."

96. On June 9, 1993, EPA conducted a public meeting for residents living near the Site. EPA also prepared and distributed fact sheets summarizing cleanup activities, and made documents available for public review. (Exh. 215; Krohn, 1180:9–23.)

97. In August 1993, Hydrometrics, an environmental consulting firm hired by ASARCO, collected soil samples from a neighboring city park and from nearby private property after some flooding had occurred in the area. EPA notified the property owners of the test results in September 1993. EPA concluded that none of the samples contained lead levels that would pose a risk to residents. (Exh. 215.)

98. EPA notified BACC and ASARCO on December 21, 1993, that based on EPA's monitoring of the cleanup activities, it appeared that the cleanup had been performed in accordance with the 106 Order and was consistent with the NCP. (Exh. 39.)

### C. BACC's Cleanup Activities

99. After signing the Administrative Consent Order, BACC hired Tetra Tech Engineering to complete and implement the RAW I and the other provisions contained in the order. (Kaiser, 79:15–19.) During 1990, Tetra Tech collected surface soil samples on a grid system that it had established at the Site in order to determine which soils required treatment. (Krohn, 1041:17–1042:11.) This soil sampling detected lead in surface soils inside the buildings at levels up to 26,720 ppm and in exterior surface soil samples at levels up to 13,440 ppm. Based on the results of the sampling, it was estimated that a minimum of 15,000 cubic yards of soil would require landfilling or solidification.

100. Tetra Tech also performed additional testing on the barrel contents. Some of the testing was duplicative of that performed by Woodward Clyde. The additional testing was required because regulatory changes had occurred which affected the usefulness of leachability tests conducted by Woodward Clyde. In addition, Woodward Clyde's tests had focused on whether the materials were compatible for storage, and did not include the level of detail required by EPA to allow for disposal of the materials. The costs associated with this additional testing totalled approximately $25,000.00. (Krohn, 1117–

1120.) The analytical results indicated that the barrels contained primarily waste oil and industrial cleaners.

101. Tetra Tech oversaw the removal of all barrels and their contents. Barrels containing trash were removed in October 1990 (Exh. 46), and all barrels were removed from the Site by September 1991 (Krohn, 1031:23–1032:1; Exh. 50).

102. During the period August to December 1990 Tetra Tech conducted further testing and removed contaminated soils in the areas where the underground storage tanks were formerly located. (Krohn, 1038:7–12; Exh. 56.) In November 1990, more than 2,000 cubic yards of petroleum contaminated soils were removed from the storage tank locations and taken to a landfill. (Exh. 56.)

103. Tetra Tech took groundwater samples from monitoring wells on the Site in August 1990 and February 1991. Samples were analyzed for total metals; total petroleum hydrocarbons; and benzene, toluene, ethyl benzene and xylene. Metal contents in the samples were reported to be below the maximum contaminant levels set by EPA. Concentrations of total petroleum hydrocarbons and benzene, toluene, ethyl benzene, and xylene were nondetectable. The results of this analysis indicated that the groundwater had not been affected by lead contamination in the soil or by hydrocarbon leakage from the underground storage tanks.

104. Tetra Tech completed a draft RAW II in February 1991, with revisions completed in June and August 1991. (Exh. 45.) EPA did not give final approval to the August 1991 revised RAW II, and it was never implemented at the Site. (Krohn, 1083:25–1084:15.)

### D. ASARCO's Cleanup Activities

105. ASARCO hired Hydrometrics, an environmental consulting firm, to prepare the RAW II and implement the 106 Order. (Wing, 1210:23–1211:1.) Hydrometrics is a subsidiary of a firm known as Encycle which in turn is a subsidiary of ASARCO. (Wing, 1210:2–8.) Plaintiffs did not challenge the propriety of using a subsidiary of ASARCO

to conduct the work, or the reasonableness of the amount charged for the work performed.

106. Various drafts of the RAW II were prepared and sent to EPA beginning in February 1992. The EPA made technical comments to each draft which resulted in changes incorporated by Hydrometrics into the next draft. (Wing, 1238:1–14.) After receiving conditional approval from the EPA for the RAW II in September 1992, Hydrometrics was allowed to begin work under the 106 Order. (Wing, 1211:13–25.) The final version of the RAW II was prepared on January 11, 1993. (Exh. 107.)

107. EPA required that the stabilization/solidification procedure be used for treating soils for which test results showed total lead as greater than 1,000 ppm and lead concentrations greater than five ppm by the toxicity characteristics leaching procedure (TCLP) test. The TCLP test measures the potential of the lead to be dissolved in water and to be mobile in a water environment. (Wing, 1224:16–1225:2, 1225:23–1226:18.)

108. Under the stabilization/solidification procedure, cement is added to the lead contaminated soil to stabilize and immobilize the lead so that it cannot migrate into groundwater. The action of the cement also creates solid blocks which possess strength and resistance to breaking. (Wing, 1225:13–22.) The soils that were so treated were then placed in a landfill area in the southeast corner of the Site. The treated soils were placed on top of other soils that had been moved to the landfill.

109. In addition to the soils which were required to be treated under the stabilization/solidification process, other soils containing lead concentrations greater than 500 ppm from the surface to two feet in depth, and greater than 1,000 ppm at two to four feet in depth were required to be removed and placed in the landfill or at a lower depth. Lead concentrations of between 500 and 1,000 ppm were permitted to be covered with two feet of uncontaminated soil, and concentrations of greater than 1,000 ppm were permitted to be covered with four feet of uncontaminated soil. (Wing, 1265:17–1266:9.)

110. After all the contaminated soils, both treated and non-treated, had been moved to the landfill, a six inch layer of gravel material was placed on top. A geotextile fabric was then placed on top of the gravel material. Imported soil was placed on top of the geotextile fabric. (Wing, 1267:23–1270:2.)

111. Hydrometrics designed the landfill with the approval of the Kansas Department of Health and Environment (KDHE), the state agency responsible for enforcing landfill regulations. (Wing, 1396:6–15.) A closure plan was also incorporated as part of the RAW II. (Exh. 107.) At the time of the trial, work at the Site had only recently been completed, and Hydrometrics was still in the process of developing post-closure activities. (Wing, 1343:21–1344:7.)

112. Under the RAW II, ASARCO was also required to develop a plan to decontaminate, demolish, and dispose of buildings, concrete, asphalt, crane rails, railroad tracks, and other structures on the Site. Initially, BACC and ASARCO did not intend to remove the buildings. During 1993, however, EPA and the City of Kansas City, Kansas, informed BACC and ASARCO that the soil under the buildings would require testing and treatment at some point, and if the soil was left in place, BACC and ASARCO would be liable for that work at some point in the future. (Wing, 1399:15–25.) If the soil beneath the buildings was not addressed, EPA and the city would provide only a conditional release at the completion of the work, and deed restrictions would be imposed on the property. (Wing, 1400:2–12.)

113. The decision was then made to demolish the buildings. The decision was influenced by the belief that the Site's marketability would be improved. (Wing, 1383:16–1384:2.) After demolition, the soil at the building sites was left in place, clean soil was imported as cover, and the remaining concrete floors or slabs were broken up to provide drainage. (Wing, 1401:4–13.)

114. The RAW II also required development of a plan to place a protective cover of clean imported fill over the Site. Hydrometrics contracted to have the fill dirt brought to the Site.

## V. Cleanup Costs

### A. BACC

115. Some of BACC's costs related to the Site cleanup were actually paid by Bank of

America National Trust and Savings Association (BOA), a separate entity. Both BACC and BOA are subsidiaries of BancAmerica Corporation, a bank holding company. BACC reimbursed BOA for those costs that BOA paid directly. This reimbursement was made pursuant to a service agreement between BACC and BOA under which BOA provided certain administrative services to BACC. (Rotticci, 1846:1–1848:22; Exh. 209.)

116. BACC incurred costs totalling $192,-616.66, paid to Woodward Clyde and Tetra Tech, in connection with investigation and removal of the barrels found at the Site.

117. BACC's barrel removal costs paid to Woodward Clyde consist of $92,272.74 incurred in 1988 and $36,367.90 incurred in 1989. Woodward Clyde's services included site reconnaissance, preparation of a health and safety plan, soil testing, report preparation, and activities directly related to barrel storage and removal. (Exh. 32.) In addition, a portion of the groundwater testing conducted by Woodward Clyde was also attributable to the barrels. (Skach, 976:18–25.) Woodward Clyde has computed that portion to be two-ninths of the cost of all groundwater testing, and the court finds this to be a reasonable computation.

118. Tetra Tech's costs attributable to barrels were incurred in 1990, 1991, and 1992. The amounts incurred were $11,844.88 in 1990, $52,077.39 in 1991, and $53.75 in 1992. (Exh. 98, 99, 204.) These expenses included the cost of removing all barrels and their contents from the Site.

119. BACC incurred costs related to underground storage tank remediation totalling $163,889.47. This total comprises Woodward Clyde charges of $2,920.60 in 1988 and $15,-519.58 in 1989 (Exh. 96), and Tetra Tech charges of $78,354.65 in 1990, $55,735.25 in 1991, $6,389.00 in 1992, and $4,970.39 in 1993 (Exh. 98, 99, 204).

120. BACC's costs associated with asbestos removal totalled $6,625.24. Woodward Clyde charged $4,185.80 in 1988 (Exh. 96), and Tetra Tech charged $2,358.94 in 1990 and $80.50 in 1991 (Exh. 78, 99, 204).

121. BACC incurred costs totalling $499,-207.38 for lead removal activity during the period 1988 through 1993. Woodward Clyde costs were $115,402.21 for 1988 and $120,-782.00 for 1989. (Exh. 96.) Tetra Tech costs were $149,305.16 in 1990, $76,925.42 in 1991, $12,130.63 in 1992, and $24,661.96 in 1993. (Exh. 98, 99, 100, 204.)

122. BACC incurred $570,395.02 in security guard costs during the period 1988 through 1993. BACC paid Woodward Clyde $11,878.02 for guard services during 1988 before undertaking the contracting for services directly. (Exh. 96.) BACC's costs for guard services were incurred as follows:

| | |
|---|---|
| 1988: | $21,702.02 (includes Woodward Clyde amount) |
| 1989: | 131,400.00 |
| 1990: | 131,400.00 |
| 1991: | 108,528.00 |
| 1992: | 122,645.00 |
| 1993: | 54,720.00 |

(Exh. 102, 103.)

123. BACC claims that attorney fees paid to the law firm Lewis, Rice & Fingersh, and its predecessor firm, Brown, Koralchik & Fingersh, were CERCLA response costs. At least some of these attorney fees are directly related to the cleanup and include activities such as designing the removal action, determining technical cleanup requirements to be contained in the work plan, negotiating contracts with environmental service providers, preparing and carrying out the work plans approved by EPA, and monitoring work progress. (Exh. 135, 136, 137.) Additional fees were also associated with obtaining information related to other potentially responsible parties (PRPs) that could be made to share in the costs of cleanup. (Aniel testimony, Sept. 22, 1994, 35–41; Exh. 217, 218, 219, 220, 221, 222.) The hourly rates charged are reasonable under the circumstances.

124. As explained more fully later in this Memorandum and Order, the court finds that not all the fees which BACC claims are directly related to the cleanup. In addition, the court finds that none of the fees sought by BACC related to identifying other PRPs are reasonable and necessary costs of response.

125. In addition to attorney fees, BACC also seeks recovery of related expenses of counsel. As discussed more fully later, the court finds that some of the expenses claimed are not recoverable.

126. BACC paid $37,672.07 to EPA in April 1990 as reimbursement for certain oversight costs incurred by EPA. BACC paid this amount pursuant to a provision in the Administrative Consent Order and in response to an invoice from EPA dated March 21, 1990. (Exh. 75.)

## B. ASARCO

127. ASARCO's costs associated with lead removal were all paid to Hydrometrics. Through February 9, 1994, ASARCO had paid Hydrometrics a total of $2,887,868.73. (Exh. 211.) Hydrometrics invoices reflect total charges as of February 9, 1994, to be $3,058,932.51, resulting in an unpaid balance of $171,063.78. (Exh. 106.) In addition to these costs, Hydrometrics also billed ASARCO for $26,995.86 in a final invoice which represented charges for the period January through April 1994. (Exh. 216.) As a result, the costs associated with lead removal incurred by ASARCO total $3,085,928.37.

128. ASARCO seeks to recover as CERCLA response costs $24,410.10 in attorney fees paid to the law firm Swidler & Berlin. (Exh. 34, 212.) The court finds that these costs were primarily incurred in either negotiations with EPA or in activities related to litigation. In addition, most of the invoice entries do not adequately describe the work being performed. (Craig, 2278:4–24; Exh. 838.)

129. ASARCO also seeks recovery of attorney fees totalling $72,026.55 paid to the firm Bradley, Campbell, Carney & Madsen for work directly related to implementing the 106 Order. (Exh. 34.) Some of these fees represent work related to determining cleanup steps, complying with the 106 Order, reviewing technical matters related to the Site, meeting with EPA regarding required cleanup actions, and negotiating work plans. As explained in more detail later in this Memorandum and Order, only a portion of these fees are reasonable and necessary costs of response. Some of the fees are related to negotiations with EPA or to litigation, or otherwise not necessary costs of response.

130. In addition to the attorney fees just discussed, ASARCO also claims fees totalling $47,733.90 paid to the law firm Bradley, Campbell, Carney & Madsen, and $29,332.34 paid to consultants for work related to identifying other PRPs. (Exh. 223.) As explained in more detail later, the court finds that none of these fees are reasonable and necessary costs of response.

## VI. Sources of Contamination

### A. Barrels

131. Based on the weight of the evidence, the court finds that the barrels and their contents were left at the Site by Trinity.

132. Gregg Langford, Trinity's employee in charge of the plant closure and cleanup, testified that over 200 barrels had been left at the Site, that those barrels had contained oil, hydraulic fluid, paint thinner, and antifreeze, and that residual amounts were left in some of the barrels. (Langford, 2090:4–2091:8.) Mr. Langford also testified that at least several barrels had been buried in the wheelabrator pit. (Langford, 2082:20–24.) The court does not find Mr. Langford's testimony that the barrels were completely empty at the time Trinity left the Site to be credible.

133. Evidence showing that barrel labels corresponded to products received at the Site by Trinity and Mosher Kansas further supports the court's finding. (Exh. 30, App. C–2; Exh. 148, 149, 182–189, and 190.)

### B. Asbestos

134. Asbestos containing material was found in Building 7 and in an outside disposal area near the northeast corner of Building 4. The disposal area contained used refractory bricks and pieces of cement. The asbestos containing material covered an area of approximately 2,500 square feet and was in a damaged, friable condition. (Exh. 28, at pp. 63–64.)

135. Refractory bricks were most likely used in connection with an operation exposing the bricks to high temperatures, such as a smelter or smokestacks leading from a smelter. (Skach, 933:24–934:13.)

136. Trinity, Mosher Kansas, and Mosher Steel were not responsible for constructing, renovating, or demolishing any buildings at the Site. (Kenney, 655:1–8; Kaiser, 140:24–142:1.)

## C. Lead

137. The lead at the Site originated from three sources: slag, smelter ash, and paint. (Walker, 1566:4–7.) ASARCO's smelter operation is solely responsible for the slag and smelter ash found at the Site. The structural steel operations of KCSS I and II, and Trinity and Mosher Kansas are the sources of the lead-based paint.

138. The court heard testimony from expert witnesses who had conducted studies to determine the relative volume of lead at the Site from each of the three sources. The studies revealed that slag accounted for 74% of the lead at the Site, smelter ash 16%, and lead paint 10%. (Walker, 1578:14–1579:2; Zindler, 2411:1–6; Exh. 131 at p. 34.) In the top two feet of soil at the Site approximately 14% of the lead is from paint. That percentage declines to approximately 5.8% in the top eight feet of soil. (Zindler, 2410:7–15.)

139. Defendants' expert witness, Dr. Alan Zindler, testified that older paint at the Site was distinguishable from newer paint that might have been used by Trinity or Mosher Kansas. He testified that the newer paints had a higher zinc content and lower lead content than the older paints. Dr. Zindler concluded that the newer paint accounts for less than 10% of the total lead contamination at the Site attributable to paint. (Zindler, 2388:11–2391:7.) Dr. Zindler did not testify concerning the time frames in which the newer or older paint was used.

140. KCSS I used lead paints throughout the time that it operated a structural steel plant at the Site. (Kenney, 2311–2329; Fitch Depo., 19:3–20; Meiners Depo., 204:23–205:16; Exh. 781.) During the period 1954–1969, KCSS I completed over 200 projects that required lead based paint. (Exh. 781; Kenney, 2311–2329.)

141. KCSS II also used lead based paint on certain projects. (Kenney, 2331:16–2333:18; Exh. 703, 704.)

142. Trinity and Mosher Kansas completed bridge work for the states of Missouri and Kansas which required use of lead based paints and thinners. This bridge work accounted for approximately 75% of all Trinity/Mosher work. (Kenney, 608:13–609:4, 611:11–15, 613:7–614:4, 618:9–22, 619:3–622:21, 623:1–624:4, 2431:24–2432:18.) The use of lead based paint is demonstrated by Trinity/Mosher purchase orders (Exh. 195), invoices (Exh. 196), and shop drawings (Exh. 161). Because many of these type of documents had been destroyed, the ones received into evidence represent only a small portion of the total. (Kenney, 2437–2441.)

143. The court heard testimony and received evidence regarding the bioavailability of lead in its various forms. Bioavailability means the tendency of lead to be absorbed and retained in the body through inhalation, ingestion, and direct contact. Exposure to lead in such fashion can be extremely toxic. Lead contained in smelter ash and paint is relatively bioavailable, but lead contained in slag is less bioavailable and therefore less toxic.

144. Dr. Bobby Wixson, an expert on lead in soil and soil remediation, testified that slag particles, even the size of sand or silt, are not bioavailable because of their density, lack of leachability, and particle size. (Wixson, 1785:7–21.) He testified that if slag particles of that size were ingested, the material would simply pass through the body's system. (Wixson, 1812:20–1813:9.)

145. Slag encapsulates the lead in a silicate matrix which is very resistant to weathering and makes the lead relatively insoluble. Since the slag lead is insoluble, it is not available for normal physiological intake by humans. (Wixson, 1784:10–25; Mielke, 1702:1–17; Walker, 1576:16–24.)

146. Dr. William J. Walker, plaintiffs' expert, performed a leach test to assess the release of lead from different types of slag found at the Site. The slag samples were ground into very small particles and leached for four hours in a pH 1.0 acid solution. The test measured the percentage of lead removed from the slag samples by the acid leachate during the time period that they interacted. The results show that between four and thirteen percent of the lead was extracted from the slag samples. Dr. Walker testified that in his expert opinion the slag is "rather insoluble." Defendants' expert, Dr. Alan Zindler, in reviewing the leach test results, concluded that the test "demonstrates the potential to remove lead from the slag with mildly acidic solutions." (Walker,

**1450**

1648:15–1650:10, 1674:18–1675:4; Zindler, 2396:18–2397:12; Exh. 131, App. E–1.)

147. Dr. Walker also performed sequential extraction tests on a number of samples. In this type of test, several aggressive chemical reagents are applied to dissolve a sample. Dr. Walker's test applied magnesium chloride, sodium hydroxide, and other chemicals to the samples. These tests were not run to assess the solubility of lead contained in the various samples. While lead was extracted from slag samples using the sequential extraction tests, the results are not indicative of lead solubility from slag under natural conditions. (Walker, 1639:6–1648:14; Exh. 131.)

148. Results of TCLP and extraction procedure for toxicity (EP–Tox) tests performed by Tetra Tech disclosed no direct correlation between the total lead found in soil samples and the lead solubility. (Wing, 1389:10–22, 1392:6–17; Exh. 107, at pp. 2–8, 2–9, table 2.)

149. EPA guidelines do not treat bioavailability as the relevant standard by which EPA undertakes or orders a CERCLA cleanup of lead. The EPA Interim Guidance on Establishing Lead Clean–Up Levels expressly provides that total lead, not bioavailability, is the standard for a CERCLA cleanup. (Exh. 730.)

150. EPA, in its 106 Order, did not require the removal of a slag monolith present on the Site. The monolith is a flat outcrop of slag created as a byproduct of the blast smelting of lead in the last century. (Exh. 38.)

151. EPA made no specific findings regarding slag at the Site, but rather required treatment of lead contaminated soil to a depth of four feet. Slag particles were included in this soil. EPA ordered the remediation of soils containing lead without regard to the type or bioavailability of the lead.

## CONCLUSIONS OF LAW

### I. CERCLA Claims

#### A. Nature of the Action—Cost Recovery vs. Contribution

CERCLA, as amended by the Superfund Amendments and Reauthorization Act (SARA), Pub.L. No. 99–499 (1986), provides two types of legal actions by which parties can recoup some or all of their costs associated with hazardous waste cleanup: cost recovery actions under § 107(a), 42 U.S.C. § 9607(a), and contribution actions under § 113(f), 42 U.S.C. § 9613(f). Section 107(a) imposes liability on responsible parties regardless of fault. *See County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1515 (10th Cir. 1991). In a contribution claim under § 113(f), "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). In practice, the different actions may ultimately yield the same result because a defendant in a § 107(a) action may bring a contribution claim against the plaintiff, thus reducing the plaintiff's award by its equitable share of the response costs.

In this case, plaintiffs brought their action under both § 107(a) and § 113(f)(1), and defendants have filed a counterclaim for contribution. The Tenth Circuit recently held that when one potentially responsible party sues another to recover expenditures incurred in cleanup and remediation, the claim is one for contribution and is controlled by § 113(f). *See United States v. Colorado & Eastern R.R. Co.,* 50 F.3d 1530, 1536 (10th Cir.1995). *See also United Technologies Corp. v. Browning–Ferris Indus., Inc.,* 33 F.3d 96 (1st Cir.1994) (treating claim by liable party for reimbursement of costs as contribution action and holding that only parties not themselves liable under CERCLA (e.g., the government) may bring cost recovery actions under § 107(a)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995). The court will therefore treat plaintiffs' claim as one for contribution under § 113(f).

#### B. Liability of Trinity and Mosher Steel

Section 113(f) allows "any person" to seek contribution from any party liable or potentially liable under § 107(a). 42 U.S.C. § 9613(f)(1). In order to maintain a successful contribution action, plaintiffs must establish that defendants are "liable or potentially liable" under § 107(a). 42 U.S.C. § 9613(f)(1). Thus, the same elements that apply to a claim brought under § 107(a) must be satisfied.

To recover under Section 107(a), a plaintiff must prove that: (1) the defendant is one of the four categories of covered persons listed under § 9607(a); (2) the site is a facility as defined in § 9601(9); (3) a "release" or "threatened release" of any "hazardous substance" at the facility in question has occurred; (4) the release or threatened release caused plaintiff to incur costs; and (5) plaintiff's response actions were consistent with the National Contingency Plan ("NCP"). *See United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 719–20 (2d Cir. 1993).

There is no dispute that the Site is a "facility" as defined in § 9601(9), and that a release or hazardous substances occurred at the Site. Plaintiffs have also incurred response costs as a result of the release. Trinity and Mosher Steel deny, however, that there has been any release of hazardous substances which may be attributable to them, and therefore they claim they are not "covered persons" under the Act. They further deny that the response actions performed by BACC and ASARCO were consistent with the NCP. The question of consistency with the NCP will be addressed first.

### 1. Consistency with the National Contingency Plan

Section 107(a)(4)(B) imposes liability on potentially responsible parties for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). Proof that a private party's response costs were "consistent with" the NCP is an element of a private cost recovery action under CERCLA. *County Line Inv. Co.*, 933 F.2d at 1512. A party seeking recovery of response costs has the burden of showing that the costs incurred were consistent with the NCP. *Artesian Water Co. v. New Castle County*, 659 F.Supp. 1269, 1292 (D.Del.1987), *aff'd*, 851 F.2d 643 (3d Cir. 1988). Trinity and Mosher Steel assert that neither BACC nor ASARCO has established that the response costs they incurred were consistent with the NCP, and therefore the

court should not allow either BACC or ASARCO to recover those costs.

The NCP is intended to direct acts taken in response to a hazardous contamination (i.e., response actions) and to prescribe procedures for those activities. 42 U.S.C. § 9605. The NCP had its origins in the 1960s when it was developed as a multi-agency strategy to deal with environmental disasters. *Ohio v. EPA*, 997 F.2d 1520, 1525 (D.C.Cir.1993). Congress later incorporated the NCP into the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1376. *Id.* At the time CERCLA was enacted in 1980, the NCP applied only to discharges into waters regulated by the Clean Water Act. *Id.* CERCLA directed the President to revise and republish the NCP, and the President assigned this responsibility to the EPA. *Id.* *See* 42 U.S.C. § 9605(a). The new version of the NCP was issued in 1982, and revised in 1985. *See* 47 Fed.Reg. 31,180 (1982); 50 Fed.Reg. 47,912 (1985). In 1990, EPA again revised the NCP to reflect changes brought about by the Superfund Amendment and Reauthorization Act of 1986 (SARA), Pub.L. No. 99–499, 100 Stat. 1613 (1986). *See* 55 Fed.Reg. 8813 (1990), codified at 40 C.F.R. Pt. 300.

The 1990 NCP specifies that any response action "carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA will be considered 'consistent with the NCP.'" 40 C.F.R. § 300.700(c)(3)(ii). For private party response actions not made pursuant to an EPA order or decree, the NCP requires substantial compliance with a list of requirements in order for the response action to be considered consistent with the NCP. 40 C.F.R. § 300.700(c)(5)–(6). Both BACC and ASARCO contend that the costs they incurred were all related to response actions that were taken in complying with EPA orders.[2] As a result, BACC and ASARCO argue that since their actions complied with EPA orders, consistency with the NCP is established.

**2.** The EPA order issued to BACC on February 7, 1990, was an administrative consent order. The order directed to ASARCO, dated December 21,

1991, was a unilateral administrative order. Both orders were issued pursuant to CERCLA Section 106.

■ Those courts that have directly addressed this issue have found that response actions taken pursuant to an EPA order or decree will be found to be consistent with the NCP if the actions were in compliance with the order or decree. *See United States v. Colorado & Eastern R.R. Co., Inc.*, No. 89-C-1786, 1993 WL 350171 (D.Colo.1993), *aff'd*, 50 F.3d 1530 (10th Cir.1995); *Central Maine Power Co. v. F.J. O'Connor Co.*, 838 F.Supp. 641 (D.Me.1993); *United States v. Western Processing Co.*, 34 Env't Rep.Cas. 1175 (W.D.Wash.1991). This view is consistent with the wording of the regulation and with EPA's intent when it drafted the regulation. *See* 55 Fed.Reg. 8797 (March 8, 1990) (discussing NCP consistency requirements and non-rebuttable presumption that actions complying with EPA order or decree are consistent with the NCP). Thus, if BACC and ASARCO establish that the actions they took were in compliance with the EPA orders, such actions are deemed to be consistent with the NCP. *See Central Maine Power Co.*, 838 F.Supp. at 647 ("The national contingency plan provides an *irrebuttable presumption* that actions taken pursuant to the terms of an EPA consent decree are consistent with the plan.") (emphasis added).

The court is mindful of plaintiffs' burden in a cost recovery action to establish the consistency of their actions with the NCP, and of the court's responsibility to independently evaluate such actions. The regulation at issue, however, is a part of the NCP. This is not a situation in which EPA is interpreting the meaning of statutory language. *See Kelley v. EPA*, 15 F.3d 1100, 1108 (D.C.Cir.1994) (An interpretive rule "represents the agency's construction of the statute that is—while not binding—entitled to substantial judicial deference."), *cert. denied*, —— U.S. ——, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995).

Instead, Congress specifically authorized the EPA to periodically revise and republish the NCP. Section 105, which gives the agency responsibility to promulgate the NCP, "provides the EPA with broad rulemaking authority to craft the NCP." *Ohio v. EPA*, 838 F.2d 1325, 1331 (D.C.Cir.1988). *See also* Exec.Order No. 12,580, 52 Fed.Reg. 2923 (1987) (President's delegation to EPA of the responsibility for amending the NCP). Section 105(a)(3) requires EPA to issue "methods and criteria for determining the appropriate extent of removal, remedy, and other measures authorized by [CERCLA]." 42 U.S.C. § 9605(a)(3). Further, Section 105(a)(4) authorizes the agency to prescribe "appropriate roles and responsibilities ... of nongovernmental entities in effectuating the plan." 42 U.S.C. § 9605(a)(4).

The conclusion that this regulation conforms with the statutory scheme and legislative intent is further supported by the objective of "CERCLA's liability scheme to provide incentives for private parties to investigate potential sources of contamination and to initiate remediation efforts." *United States v. A & N Cleaners and Launderers, Inc.*, 854 F.Supp. 229, 239 (S.D.N.Y.1994). This regulation serves to encourage private parties to work with the EPA in undertaking cleanup actions, by giving those parties some assurance that their actions, under the direction of the EPA, will meet the requirements of the NCP.

Admittedly, the regulation grants to parties who complete cleanup actions in conformity with EPA orders or decrees some advantage in bringing cost recovery actions over other private parties whose response actions were taken independently. This court's role, however, is simply to determine whether plaintiffs' actions were consistent with the NCP, not to question the wisdom or appropriateness of a particular provision within the NCP. Even if the EPA exceeded its authority or otherwise deviated from the statutory scheme in promulgating the regulation, this court is not the proper place to raise such an argument. *See* 42 U.S.C. § 9613(a) (requiring review of CERCLA regulations to be brought only in the D.C.Circuit and within 90 days from the date of promulgation).

■ In this case, BACC and ASARCO have established that the cleanup work they performed was in compliance with the EPA orders. BACC and ASARCO submitted workplans to the EPA in accordance with the orders, and those workplans were approved by the EPA. The work conducted at the Site has been done in accordance with those plans, and the EPA has overseen the work.

Further, EPA's December 21, 1993, letter to ASARCO indicates that the work to that time had been performed in accordance with the Section 106 unilateral order. The court determines that the response actions taken by BACC and ASARCO are in compliance with the EPA orders and therefore consistent with the NCP.

Trinity and Mosher Steel attack plaintiffs' response actions as being inconsistent with the NCP. The first claimed deficiency is the alleged failure to meet the NCP's public comment requirements. Second, defendants argue that BACC and ASARCO conducted a remedial action rather than a response action as BACC and ASARCO contend. As such, defendants claim that plaintiffs failed to take all the actions required by a remedial response.

As discussed earlier, in order to carry their burden of proving consistency with the NCP, plaintiffs need only show that they complied with the terms of the EPA orders. Defendants have not shown that either the public comment requirements or the actions related to a remedial response are a part of the EPA orders. Defendants argue that because the EPA orders contain language requiring the plaintiffs to comply with all other statutes and regulations, and because the NCP is a federal regulation, the orders themselves therefore require compliance with the NCP. The court is not persuaded by this argument. To place such an interpretation on the EPA orders would in effect render meaningless the regulation that deems actions taken in compliance with such orders to be consistent with the NCP. See 40 C.F.R. § 300.700(c)(3)(ii).

Trinity and Mosher Steel have not rebutted plaintiffs' evidence showing compliance with the EPA orders. Specifically, defendants argue that ASARCO failed to adequately investigate the horizontal extent of contamination and also failed to comply with applicable statutes and regulations as required by the EPA order. The evidence, however, satisfies the court that ASARCO's actions conformed with the requirements of the EPA order.

First, the EPA order did not require ASARCO to investigate the full extent of possible contamination in areas adjacent to the Site where smoke stacks and tunnels had been located. While the order includes in its definition of "the Site" "all other areas contaminated with releases of hazardous substances" from the facility, there is no indication from other sections of the order that ASARCO was required to perform work outside the boundaries of the property, other than the area between the fence and street. The description of the removal action work plan, contained in the modification to the order dated December 16, 1992, addresses only the areas within the perimeter fence and between the fence and street. Accordingly, there is no evidence that ASARCO failed to comply with the EPA order by omitting from its investigation and response action the former locations of the smoke stacks and tunnels.

Defendants also challenge ASARCO's compliance with the Kansas Solid Waste Statute and its regulations. The EPA order required that actions taken pursuant to the order must be "performed in accordance with all applicable local, state, and federal laws and regulations." EPA's modification of the order specifically required the Remedial Action Workplan Phase II (RAW II) to include in its landfill design "all local, state and federal landfill requirements including, but not limited to, ... the Kansas Solid Waste Statute, Kan.Stat.Ann. § 65–34 (1991), and the Kansas Solid Waste Management Regulations, Kan.Admin.Regs. § 29 (1991)."

The Kansas regulations, which potentially apply to the on-site landfill, required plaintiffs to develop a closure plan and provide for long-term care. See Kan.Admin.Regs. § 28–29–12. The regulations also require that plaintiffs provide financial assurances for closure and post-closure care. Kan.Admin.Regs. § 28–29–17a. The evidence at trial establishes that Hydrometrics, ASARCO's contractor, properly designed the landfill with the approval of the Kansas Department of Health and Environment, the state agency responsible for enforcing the landfill regulations. A closure plan was incorporated as a part of the RAW II. At the time of the trial, work at the Site had only recently been completed, and Hydrometrics was still in the process of developing appropriate post-clo-

sure activities. There was no evidence presented that would show plaintiffs had failed to comply with the applicable statutes and regulations.

In summary, the court finds that plaintiffs' response actions were in compliance with the EPA orders and therefore are deemed consistent with the National Contingency Plan.

### 2. Trinity and Mosher Steel as Responsible Parties

Parties who own or operate a facility at the time of disposal of hazardous substances at that facility are liable under CERCLA § 107(a)(2). Plaintiffs contend that both Trinity and Mosher Steel were operators at the Site and that Trinity is further liable as a successor-in-interest to Mosher Kansas. Mosher Steel argues that it was never at the Site and therefore cannot be considered an operator. Both Trinity and Mosher Steel claim that there were no releases of hazardous substances at the Site during the period that Mosher Kansas and Trinity carried on operations there. Trinity further claims that it cannot be held responsible for any release that may have occurred while Mosher Kansas was operating at the Site.

### a. Trinity and Mosher Steel as Operators

Mosher Kansas was a wholly owned subsidiary of Trinity created in 1984 to operate the Kansas City structural steel plant. In December 1985, Trinity dissolved Mosher Kansas and took over the direct operation of the plant. Mosher Steel is a separate subsidiary of Trinity. Plaintiffs contend that Mosher Steel and Trinity both exercised direct control over the operations of Mosher Kansas and the Kansas City plant and that they are consequently responsible parties under CERCLA. Plaintiffs further argue that Trinity is a successor corporation to Mosher Kansas and therefore liable for any hazardous releases at the Site that occurred prior to the dissolution of Mosher Kansas.

CERCLA defines "operator" circuitously as any person operating a facility. 42 U.S.C. § 9601(20)(A). Despite the statute's lack of specificity about the scope of operator liability, courts have consistently found that "a person who is an operator of a facility is not protected from liability by the legal structure of ownership." *United States v. Kayser-Roth Corp., Inc.*, 910 F.2d 24 (1st Cir.1990), *cert. denied*, 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991). As a result, CERCLA "has expanded the circumstances under which a corporation may be held liable for the acts of an affiliated corporation such that, when a corporation is determined to be the operator of a subsidiary or sister corporation, traditional rules of limited liability for corporations do not apply." *Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1221 (3d Cir.1993).

Courts are split over the proper test to use for imposing operator liability. Some courts require a party to have exercised some actual control while other courts have imposed liability based solely on a party's authority or capability to control. *See FMC Corp. v. Aero Indus., Inc.*, 998 F.2d 842, 846 (10th Cir. 1993) (citing cases using both tests). Under the actual control test, a corporation will be held liable for another corporation's violations when there is evidence of substantial control over the activities of the other. *Kayser–Roth*, 910 F.2d at 27. Operator liability under the authority to control test, in contrast, is based solely on a corporation's capability to control, even if it never exercised that capability. *See Nurad, Inc. v. William Hooper & Sons Co.*, 966 F.2d 837, 842 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992).

The Tenth Circuit has never decided which approach should be followed. *See FMC Corp.*, 998 F.2d at 846. It is not necessary to decide the proper approach in this case since the court has found that both Trinity and Mosher Steel exercised actual control over the plant's operations. *See* Finding of Fact Number 33.

Under the actual control test, operator status "requires more than merely complete ownership and the concomitant general authority or ability to control that comes with actual ownership. At a minimum, it requires active involvement in the activities of the subsidiary." *Kayser–Roth*, 910 F.2d at 27. Because the focus is on the extent of control exercised rather than on ownership, "not only may a parent corporation be deemed the operator of its subsidiary, but a corporation may also be considered the operator of its

sister corporation." *Lansford*, 4 F.3d at 1222. The factors a court should consider in making this determination "focus on the extent of the corporation's involvement in the other corporation's day-to-day operations and its policy-making decisions." *Id.* Evidence of control over another corporation's environmental decisions is a relevant but not dispositive factor in determining operator liability. *Kayser–Roth*, 910 F.2d at 27 n. 8.

The evidence shows that both Trinity and Mosher Steel were directly involved in the day-to-day operations of Mosher Kansas and the Kansas City Site. The court concludes that they are operators of the Site within the meaning of CERCLA.

### b. Hazardous Substance Disposal

■ Trinity and Mosher Steel can escape CERCLA liability if the facts show that no disposal of a hazardous substance occurred during the time they were operators. *See* 42 U.S.C. § 9607(a)(2). CERCLA adopts the definition of "disposal" from the definition contained in the Solid Waste Disposal Act. 42 U.S.C. § 9601(29). That definition reads:

> The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste so that such solid was or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).

The court has found that disposal of hazardous substances occurred while Trinity and Mosher Steel were operators at the Site. The specifics of these disposals and the amounts involved are discussed below in the section on allocation. For purposes of establishing liability, however, the plaintiffs have established that at least some disposal of hazardous substances occurred. *See Alcan*, 964 F.2d at 259 (no "quantitative requirement" in CERCLA's definition of hazardous substance).

### C. BACC's Liability

The analysis set out above establishes the CERCLA liability of Trinity and Mosher Steel. ASARCO is not contesting the fact that it is a liable party under CERCLA based on its status as a former owner and

operator. BACC, however, contends that it is not a "covered person," and therefore not liable under CERCLA, even though it is the current owner of the Site. BACC's argument is based on the statute's exception to the definition of "owner."

■ Under § 101(20)(A), the term "owner or operator" "does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A). The purpose of this secured creditor exception is "to shield from liability those 'owners' who are in essence lenders holding title to the property as security for the debt." *Waterville Indus., Inc. v. Finance Auth. of Maine*, 984 F.2d 549, 552 (1st Cir.1993). A party seeking to invoke the secured creditor exception has the burden of establishing its entitlement to the exception. *See United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1556 (11th Cir.1990), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991); *United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573, 578 (D.Md.1986). In order to prevail in its argument that the secured creditor exception applies, BACC must establish both that it holds indicia of ownership primarily to protect its security interest in the Site and that it did not participate in the management of the facility. *See In re Bergsoe Metal Corp.*, 910 F.2d 668, 671 (9th Cir.1990).

BACC signed an Administrative Consent Order with the EPA in 1990 and began some preliminary work to clean up the Site. In September, 1991, BACC notified EPA that under new regulations promulgated by EPA to better define the secured creditor exception, BACC was not liable under CERCLA and was not obligated to perform any additional site remediation. EPA promulgated the regulations "to clarify and specify the range of activities that may be undertaken by a person who maintains indicia of ownership in a facility primarily to protect a security interest, without such activities being considered to be participation in the facility's management." 57 Fed.Reg. 18,344 (Apr. 29, 1992). The regulations, however, were recently stricken down. In *Kelley v. EPA,* 15

F.3d 1100 (D.C.Cir.1994), *cert. denied,* ——— U.S. ———, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995), the court held that EPA lacked the authority to interpret the CERCLA sections that define liability, including the secured creditor exception. In evaluating BACC's liability, therefore, the court will be guided solely by the statute's language and the interpretation of that language by other courts.[3]

BACC first claims that it did not participate in the management of KCSS II prior to accepting the deed in lieu of foreclosure. Under § 101(20)(A), "participation in management" by a person who holds indicia of ownership primarily to protect a security interest will void the exception. 42 U.S.C. § 9601(20)(A). The extent to which a person may become involved without being considered to be participating in management is not, however, defined by the statute or addressed in the legislative history. *See Bergsoe,* 910 F.2d at 672 (not defined in statute); *Fleet Factors,* 901 F.2d at 1558 n. 11 (describing "sparse" legislative history on the subject).

The Tenth Circuit has not addressed the secured creditor exception and other courts have not uniformly interpreted the extent of the exception. *See Kelley,* 15 F.3d at 1103–04 (describing "[c]onflicting judicial interpretations as to the scope of this secured creditor exception"). The Eleventh Circuit, in its *Fleet Factors* decision, held that participation in day-to-day operational management was not required for lenders to be liable, but that "a secured creditor will be liable if its involvement with the management of a facility is sufficiently broad to support the inference that it *could affect* hazardous waste disposal decisions if it so chose." 901 F.2d at 1558 (emphasis added).

In formulating its "could affect" standard, the *Fleet Factors* Court specifically rejected the interpretation developed in earlier district court decisions which distinguished "between permissible participation in the finan-

cial management of the facility and impermissible participation in the day-to-day or operational management of a facility." *Id.* at 1556. In *United States v. Mirabile,* No. 84–2280, 1985 WL 97 (E.D.Pa.1985), the court held that "before a secured creditor ... may be held liable, it must, at a minimum, participate in the day-to-day operational aspects of the site." *Id.* at *6. The court found that "the participation which is critical is participation in operational, production, or waste disposal activities. Mere financial ability to control waste disposal practices ... is not ... sufficient for the imposition of liability." *Id.* at *4. Other district courts, as cited in the *Fleet Factors* decision, had also adhered to this distinction between operational management and financial management. *See, e.g., Guidice v. BFG Electroplating and Mfg. Co., Inc.,* 732 F.Supp. 556, 561–62 (W.D.Pa. 1989); *United States v. New Castle County,* 727 F.Supp. 854, 866 (D.Del.1989); *United States v. Nicolet, Inc.,* 712 F.Supp. 1193, 1204–05 (E.D.Pa.1989); *Rockwell Int'l Corp. v. IU Int'l Corp.,* 702 F.Supp. 1384, 1390 (N.D.Ill.1988).

The First, Fourth, and Ninth Circuits have all addressed the secured creditor exemption subsequent to the Eleventh Circuit's *Fleet Factors* decision, but only the Ninth Circuit has specifically examined the "participating in management" question. In *Bergsoe,* the Ninth Circuit declined to establish a specific rule on this issue, but did hold that "there must be *some* actual management of the facility before a secured creditor will fall outside the exception." 910 F.2d at 672. After considering the various activities of the defendant (negotiating and encouraging the building of a plant, possessing certain rights under a lease, and taking actions related to a workout), the court concluded that the defendant did not participate in the management of the facility. *Id.* at 672–73.

■ After reviewing the statutory language and applicable case law, this court

---

3. Even if the regulations had been upheld, it is not clear that the court would have been bound by them in this case. At least one court held that the regulations, promulgated on April 29, 1992, were prospective only. *See Northeast Doran, Inc. v. Key Bank of Maine,* 15 F.3d 1, 3 n. 1 (1st Cir.1994); *Waterville Indus., Inc. v. Finance*

*Auth. of Maine,* 984 F.2d 549, 553 (1st Cir.1993). *But see United States v. Fleet Factors Corp.,* 819 F.Supp. 1079, 1085 (S.D.Ga.1993) (holding that court is bound to give deference to EPA's lender liability rule even though events occurred prior to publication of final rule).

concludes that a secured lender does not participate in the management of a facility by taking actions related to the financial aspects of the facility. A lender crosses the "participating in management" line when it actually engages in activities related to the facility's operational management. Liability should be based on a lender's activities relating to the facility, and not solely on the lender's capability to influence the decisions about disposal of hazardous substances.

■ Applying this standard to the facts of the case now before it, the court concludes that BACC did not participate in the management of the KCSS II facility. Under the loan agreement with KCSS II, BACC took a security interest in the accounts receivable, inventory, machinery, equipment, and real estate. The agreement provided a formula to determine the maximum amount that KCSS II could borrow at any one time. The agreement gave BACC certain rights which included receipt of periodic financial statements, the ability to inspect the inventory on the premises, and the option to notify KCSS II's customers to send remittances directly to BACC. The loan agreement also contained several "negative covenants" which restricted actions that KCSS II could take without BACC's approval. These negative covenants included, among others, restrictions on the increase in executive compensation, material changes in management, creation of additional liens, material changes in the type of business, and purchase of fixed assets valued at more than $50,000.

During the period that the loan agreement was in effect, BACC took a number of actions designed to protect its investment. BACC representatives visited the Site on a regular basis. These visits were at least quarterly and later increased in frequency to every 30 days. The purpose of the visits was to review financial records, verify the accounts receivable documentation, and identify inventory on hand. During these visits, BACC representatives were not involved in giving instructions to KCSS II personnel regarding operational matters. While auditors for BACC may have visited the Site more frequently, the activities during their visits were focused exclusively on the financial rather than operational aspects of the company.

BACC also instituted a lock box arrangement under which KCSS II customers sent remittances directly to a receiving bank for processing. The bank then forwarded the remittances to BACC. This type of arrangement is common in the commercial financing business. BACC implemented the arrangement only after it had evidence that KCSS II had been diverting some of its funds. The lock box arrangement was intended to protect BACC's security interest in the accounts receivable, and in no way did it cause BACC to involve itself in the operational management of the company.

Trinity and Mosher Steel argue that by requiring KCSS II to obtain BACC approval before bidding on jobs valued over a set amount, BACC was exerting considerable control over KCSS II's operations. The court views this as BACC simply protecting its financial interests. As stated in *Bergsoe:* "Lenders normally extend credit only after gathering a great deal of information about the proposed project, and only when they have some degree of confidence that the project will be successful. A secured creditor will always have some input at the planning stages of any large-scale project and, by the extension of financing, will perforce encourage those projects it feels will be successful. If this were 'management,' no secured creditor would ever be protected." 910 F.2d at 672.

The court finds that none of BACC's activities injected it into the day-to-day operations of KCSS II to such a degree as to preclude application of the secured creditor exception. The rights that BACC retained and exercised under the loan agreement involved monitoring only the financial aspects of KCSS II's operations. As a result, BACC did not participate in management prior to accepting the deed in lieu of foreclosure.

■ Even though it did not participate in management, BACC may nevertheless be liable under CERCLA if it does not hold indicia of ownership primarily to protect its security interest. Under this requirement, the court must determine *why* BACC holds title to the property. *See Bergsoe,* 910 F.2d at 671. The protection under CERCLA's secured creditor exception is not lost when a party

takes actual ownership as long as prompt efforts are made to dispose of the property. *United States v. McLamb*, 5 F.3d 69, 73 (4th Cir.1993); *Waterville Indus., Inc. v. Finance Auth. of Maine*, 984 F.2d 549, 553 (1st Cir. 1993).

In *Waterville Industries*, the First Circuit held that a prior owner of contaminated property was protected by the secured creditor exception when it took action to divest itself of ownership within six months after obtaining clear title to the property. *Id.* at 554. In *McLamb*, the Fourth Circuit ruled that a bank was exempt from CERCLA liability related to property to which it took title after a mortgagor's default. The bank "almost immediately placed the property on the market, took no steps to use or manage the land during its ownership, and ultimately sold the property to the first able buyer." *McLamb*, 5 F.3d at 72.

The court concludes that the efforts of BACC to sell the property were sufficiently prompt after it took the deed in lieu of foreclosure. The lease entered into between BACC and Mosher Kansas granted to Mosher Kansas an option to purchase the property at its fair market value after the 48th month of the lease term. BACC also listed the property for sale with a commercial real estate agent immediately after leasing the property. No offers to buy the property were received during the period that Trinity/Mosher occupied the Site. After Trinity/Mosher vacated the property, BACC retained another commercial realtor who actively tried to sell the property. This listing agreement was in effect from March 9, 1987 through September 1988. Although BACC received and rejected three written offers in 1988, the amounts offered for the property were all less than the outstanding debt owed to BACC.

The court concludes that BACC made adequately prompt efforts to resell the property to meet the requirement of holding indicia of ownership primarily to protect its security interest. *See* 42 U.S.C. § 9601(20)(A).

**D. Response Costs**

Having determined which parties are liable for the cleanup, the court must next decide what costs incurred are "necessary costs of response." 42 U.S.C. § 9607(a)(4)(B). CERCLA defines "response" as a "removal action" or a "remedial action." 42 U.S.C.A. § 9601(25). Removal actions are actions designed to effect an interim solution to a contamination problem. The definition provides in part as follows:

"remove" or "removal" means the cleanup or removal or released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). Remedial actions are designed to effect a permanent solution to the contamination problem. The definition of remedial actions provides in part as follows:

"remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

42 U.S.C. § 9601(24).

In this case, both BACC and ASARCO allege that they have incurred necessary response costs. Trinity and Mosher Steel contend that at least some of those costs do not fall within the category of necessary response costs, and therefore are not recoverable by BACC and ASARCO in their cost recovery actions.

*1. BACC's Response Costs*

A party seeking to recover under CERCLA Section 107(a) must establish that the release or threatened release caused the party to incur response costs. Defendants ar-

gue that BACC did not incur response costs because another entity, Bank of America National Trust and Savings Association (BOA), actually paid the costs that BACC is claiming as response costs.

The evidence at trial established that the costs in question were all paid by either BACC or BOA. BACC reimbursed BOA for those expenses that BOA paid directly. This reimbursement was made pursuant to a service agreement between BACC and BOA under which BOA provided certain services to BACC, including payment of expenses on behalf of BACC. Since BACC either paid the costs directly or reimbursed BOA for the costs it paid, the court finds that the response costs in question were all incurred by BACC.

The following sections outline the response costs BACC alleges it incurred. In addition to the argument that BACC did not incur any costs, Trinity and Mosher Steel also contest a number of the specific categories of costs for which BACC seeks recovery.

### a. Barrel Removal

BACC claims response costs associated with barrel removal totalling $192,616.66. This includes $128,640.64 paid to Woodward Clyde during 1988–1989 and $63,976.02 paid to Tetra Tech during 1990–1992.

Trinity and Mosher Steel argue that some or all of the testing performed by Tetra Tech was duplicative of that done by Woodward Clyde and was therefore not necessary. Defendants further contend that the total costs associated with barrel removal should not be considered CERCLA response costs because of the 272 barrels found at the Site in 1988, 222 were empty or contained trash. Of the remaining 50, 30 contained petroleum products which are not considered hazardous substances for purposes of CERCLA. Only 20 barrels were found to contain hazardous materials, and defendants contend that a reasonable response cost for disposing of those 20 barrels would be $16,700. Finally, Trinity and Mosher Steel maintain that none of the hazardous materials found in those barrels were linked to either defendant. This last argument will be addressed in the section below discussing allocation.

The evidence establishes that barrels were found at the Site and that it could not immediately be determined whether some or all of them contained hazardous waste material. Given the results of the environmental audit conducted by Woodward Clyde and the evidence that the contents of at least some of the barrels may have leaked out, it was reasonable to conduct further testing to determine whether the barrels and the surrounding soil contained hazardous substances.

The court notes that response costs under CERCLA includes the cost of both removal and remedial actions, and "removal" actions are specifically defined to include such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances. *See* 42 U.S.C. § 9601(23). Costs of investigating contamination and planning the appropriate response may be recoverable as necessary response costs. *See Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir.1989) (holding that site investigation costs are response costs within meaning of CERCLA); *Bolin v. Cessna Aircraft Co.,* 759 F.Supp. 692, 711 (D.Kan. 1991) (groundwater testing potentially recoverable as response cost). This is true even if the testing later reveals no actual contamination. *See Lansford–Coaldale Joint Water Authority v. Tonolli Corp.,* 4 F.3d 1209, 1219 (3d Cir.1993) (holding that plaintiff may recover for monitoring and evaluation costs even if testing failed to establish any threat of future environmental harm); *City of New York v. Chemical Waste Disposal Corp.,* 836 F.Supp. 968, 980 (E.D.N.Y.1993) (initial monitoring, assessment, and evaluation expenses recoverable even absent any subsequent recoverable response costs); *Artesian Water Co. v. New Castle County,* 659 F.Supp. 1269, 1285–87 (D.Del.1987) (holding that monitoring and evaluation costs are response costs even if no further response costs have been incurred), *aff'd,* 851 F.2d 643 (3d Cir.1988).

Under the facts of this case, the court concludes that BACC's costs related to assessment, evaluation, testing, and planning for removing the hazardous substances found in the barrels are all potentially recoverable response costs under CERCLA. The barrels were observed and assessed during Woodward Clyde's initial site assessment during May and June, 1988. In July 1988, Woodward Clyde inventoried the barrels and

collected samples for chemical analysis. As a result of that analysis, Woodward Clyde concluded that 20 barrels contained potentially hazardous compounds. Woodward Clyde also prepared a health and safety plan which was necessitated by the existence of the barrels and to satisfy insurance requirements. A portion of the soil and groundwater testing is also attributable to the barrels because of the concern generated by stained soils located near the barrels. The costs incurred by BACC in these activities totalled $128,640.64. The court concludes that this amount is a potentially recoverable response cost under CERCLA.

 Defendants contend that some of the testing performed by Woodward Clyde were duplicated later by Tetra Tech, and that the costs related to this portion of the testing are not recoverable response costs. EPA required additional testing for two reasons. First, some regulatory changes effective after the time of Woodward Clyde's testing affected the usefulness of the leachability tests that were performed. Second, Woodward Clyde's work focused on determining whether the materials contained in the barrels were compatible for storage. As a result, the Woodward Clyde testing did not include the level of detail required by EPA to allow for disposal of the materials. The costs associated with the additional testing needed for this second category totalled approximately $25,000.

The court concludes that the costs related to testing and characterizing the barrel contents are recoverable response costs even though some of the testing performed by Tetra Tech paralleled that done by Woodward Clyde. CERCLA requires that plaintiff's monitoring and investigation expenses must have been incurred in a reasonable manner. *Lansford–Coaldale Joint Water Auth.,* 4 F.3d at 1219. It does not necessarily follow, however, that expenses related to some of Woodward Clyde's testing were unreasonable simply because EPA required Tetra Tech to again perform some of the same type of tests. Courts have explicitly allowed as response costs those expenses related to

duplicative testing under certain circumstances. *See Artesian Water Co. v. New Castle County,* 851 F.2d 643, 651 (3d Cir. 1988) (holding that plaintiff not required to rely solely on testing by state and expenses related to duplicate testing were recoverable response costs); *Bolin,* 759 F.Supp. at 711 (same). In this case, the testing performed by Tetra Tech was not strictly duplicative because it was done for a different purpose and under different requirements than the testing performed by Woodward Clyde. Based on the testimony and evidence presented, the court finds that the testing performed by Woodward Clyde was reasonable based on the information available at the time.

 BACC also claims that $63,976.02 paid to Tetra Tech during 1990–1993 for services related to the barrels should be treated as a CERCLA response cost. As discussed above, a portion of this expense is related to further testing and characterization of the barrels' contents. The court finds that the costs related to testing and characterization are response costs based on the reasoning outlined above. Defendants, however, also challenge that portion of Tetra Tech's cost related to the disposal of the barrels and contents which contained no hazardous materials. Of the 272 barrels found at the Site, 222 were empty or contained trash, 30 contained petroleum products which are not considered hazardous substances for purposes of CERCLA, and only 20 barrels were found to contain hazardous materials. Defendants contend that only the costs related to disposal of those 20 barrels should be considered response costs.

While BACC had legitimate business reasons for removing the barrels containing trash and other non-hazardous materials, the costs associated with this effort are not CERCLA response costs. The evidence does not clearly delineate that portion of the costs billed by Tetra Tech attributable solely to the removal of trash and non-hazardous materials. The evidence does show that the removal of these materials was accomplished in October 1990 and in July 1991.[4] Tetra

---

4. See Exhibit 46, Container Characterization and Removal Report dated January 17, 1991, which indicates that on October 24, 1990, drums of

trash were emptied into a roll-off box and taken to a landfill. The empty drums were crushed and staged for future disposal. Exhibit 50, a

Tech's direct costs for those months attributable to container characterization and removal totalled $5,451.91.[5] In addition, Tetra Tech paid subcontractor charges to Heritage Remediation/Engineering which appear to be related solely to the disposal of non-hazardous materials and drums and which total $27,942.00.[6] These amounts, which total $33,393.91, will be deducted from Tetra Tech's total charges related to container characterization and removal in computing CERCLA response costs. As a result, the court finds that Tetra Tech charges in the amount of $30,582.11 are to be considered CERCLA response costs.

In summary, the court finds that all of BACC's costs associated with assessment, evaluation, testing, and planning for removing hazardous substances found in the barrels left at the Site are potentially recoverable response costs under CERCLA even though most of the barrels were ultimately found not to contain hazardous substances. With respect to costs of actual removal, only that portion of the cost of removing the barrels which is related to barrels found to contain hazardous substances is a potentially recoverable CERCLA response cost. As a result, the court concludes that BACC incurred a total of $159,222.75 in CERCLA response costs related to investigating and removing the barrels and their contents.

### b. Underground Storage Tank Remediation

BACC claims that it incurred total costs of $163,889.47 for underground storage tank remediation. This amount was paid to Woodward Clyde and Tetra Tech during the period 1988 through 1993.

Defendants argue that the costs associated with removing the underground storage tanks are not CERCLA response costs because the tanks contained only petroleum which is specifically excluded from the definition of "hazardous substance" under CERCLA. Defendants further contend that BACC has failed to establish that defendants ever

used the storage tanks while on the Site and have failed to show that any release from the tanks occurred during that period. BACC responds that the petroleum exclusion does not apply in this case because the petroleum was mixed with other hazardous waste. BACC further contends that the evidence is sufficient to conclude that defendants made use of the tanks and that releases of hazardous materials from the tanks occurred during the period in which defendants occupied the Site.

CERCLA excludes petroleum from the definition of "hazardous substance" for purposes of liability under the statute. Section 9601(14) provides that the "term [hazardous substance] does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance." 42 U.S.C. § 9601(14). *But see* 50 Fed.Reg. 13,-460 (April 4, 1985) (commentary to final rule-making) ("EPA does not consider materials such as waste oil to which listed CERCLA substances have been added to be within the petroleum exclusion.").

Courts have interpreted the petroleum exclusion to exclude from CERCLA coverage otherwise hazardous substances that are inherent in petroleum, or that are added during the refining process. *See Wilshire Westwood Assoc. v. Atlantic Richfield Corp.*, 881 F.2d 801 (9th Cir.1989); *United States v. Western Processing Co., Inc.*, 761 F.Supp. 713 (W.D.Wash.1991); *United States v. Alcan Aluminum Corp.*, 755 F.Supp. 531, 539 (N.D.N.Y.1991), *aff'd in relevant part*, 990 F.2d 711 (2d Cir.1993); *City of New York v. Exxon Corp.*, 744 F.Supp. 474, 489–90 (S.D.N.Y.1990); *Washington v. Time Oil Co.*, 687 F.Supp. 529, 531–32 (W.D.Wash.1988). However, courts have refused to extend the petroleum exclusion to "hazardous substances which are added to petroleum or which increase in concentration solely as a result of contamination of the petroleum dur-

---

letter from Tetra Tech to EPA dated September 18, 1991, reported that during July 23–25, 1991, the remainder of the non-hazardous materials were taken off the site.

**5.** See Exhibit 99, Tetra Tech invoices for October 1990 and July 1991.

**6.** See Exhibit 99, Heritage Remediation/Engineering invoices dated April 22, 1991, and July 31, 1991.

ing use." *Southern Pac. Transp. Co. v. California,* 790 F.Supp. 983, 986 (C.D.Cal.1991) (quoting EPA General Counsel, Scope of the CERCLA Petroleum Exclusion Under Sections 101(14) and 104(a)(2) (July 31, 1987)); *see also Cose v. Getty Oil Co.,* 4 F.3d 700, 704–05 (9th Cir.1993) (crude oil tank bottoms not within petroleum exclusion); *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 266–67 (3d Cir.1992) (petroleum exclusion not applicable to hazardous substances added to oil before release); *United States v. Amtreco, Inc.,* 846 F.Supp. 1578, 1584–85 (M.D.Ga.1994) (petroleum product mixed with creosote not within petroleum exclusion); *United States v. Western Processing, Inc.,* 761 F.Supp. 713, 722 (W.D.Wash.1991) (petroleum exclusion not applicable to waste oil resulting from rinsing and cleaning oil tanks when hazardous substances from tanks' interiors were added to the waste oil during cleaning).

▮ The evidence in this case does not disclose that any substance other than gasoline was ever stored in the tanks, and there is no evidence that any other substances were mixed with the gasoline. In its attempt to bring into CERCLA the costs associated with the removal of the underground storage tanks and the surrounding soil, BACC points to evidence that soil contaminated with petroleum beneath the storage tanks had lead levels which exceeded the amount of lead normally found in gasoline. The court is not persuaded that this fact alone places the storage tank remediation outside CERCLA's petroleum exclusion. The remediation effort was directed not at cleaning up the lead found beneath the leaking storage tanks, but was undertaken to remove the storage tanks and the surrounding soil which had been contaminated with leaking gasoline. This work falls squarely within the petroleum exclusion contemplated in CERCLA.

For these reasons, the court concludes that BACC's costs associated with the removal of underground storage tanks and the surrounding soil are not CERCLA response costs.

### c. Asbestos Remediation

BACC's costs associated with asbestos remediation totalled $6,625.24, paid to Woodward Clyde and Tetra Tech.

Defendants contend that BACC may not recover under CERCLA for removal of asbestos containing materials because CERCLA provides *no remedy for removal of asbestos related to building components.* The court has previously ruled, however, that under the facts of this case, costs related to asbestos remediation could constitute CERCLA response costs. *See* Memorandum and Order entered March 12, 1992, at 9 (Doc. 242).

Material that is a product as opposed to waste, and is in consumer use, may fall outside the ambit of CERCLA under the consumer product exception. A "facility" is defined under CERCLA as "(A) any building, structure, installation, equipment, ... or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use." 42 U.S.C. § 9601(9). Numerous courts have held that asbestos and other materials are consumer products in consumer use and are thus excluded from the definition of facility. *See, e.g., Kane v. United States,* 15 F.3d 87 (8th Cir.1994).

Most of those cases involved removal of asbestos from buildings. *See Dayton Independent School Dist. v. U.S. Mineral Products Co.,* 906 F.2d 1059, 1064–65 (5th Cir. 1990) (barring CERCLA action to recover cost of removal of asbestos from structures of buildings); *3550 Stevens Creek Assoc. v. Barclays Bank of Cal.,* 915 F.2d 1355, 1363–65 (9th Cir.1990) (same), *cert. denied,* 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). In this case, even though the source of the asbestos was asbestos bricks, a building material, the bricks were no longer a part of a building structure, but instead were scattered about the Site in a damaged and friable condition. Under the facts of this case it may be possible to classify the cost of asbestos removal as a CERCLA response cost.

▮ However, plaintiffs have not presented any evidence to show that Trinity and Mosher Steel were in any way responsible for the bricks or that a "release" of asbestos occurred during the time that Trinity and Mosher Steel operated the facility. BACC

contends that because Trinity and Mosher Steel used heavy equipment at the Site, including trucks and forklifts, the equipment was likely to have driven over the bricks, and thus caused a release of asbestos. The court views this as speculation which is unsupported by the evidence.

Because BACC has failed to establish that Trinity and Mosher Steel were responsible for bringing the bricks onto the Site or that a release of asbestos occurred during the time that Trinity and Mosher Steel operated the facility, the court finds that defendants have no liability for the costs associated with asbestos removal. As a result, the asbestos removal cost will not be treated as a CERCLA response cost for purposes of this litigation.

### d. Lead Removal

██ BACC incurred costs totalling $499,-207.38 for lead removal activity during the period 1988 through 1993. This amount was paid to Woodward Clyde and Tetra Tech. Based on the testimony and evidence presented at trial, the court concludes that these costs were reasonable and necessary costs of response.

### e. Guard Costs

██ BACC incurred $570,395.02 in security guard costs during the period 1988 through 1993.

BACC's security measures are acceptable response costs within the meaning of CERCLA. CERCLA § 107(a)(4)(B) allows recovery of response costs which includes the costs of actions "necessary to prevent ... damage to the public health ... [including] security fencing or other measures to limit access." 42 U.S.C. § 9601(23). *See also Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir.1989); *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 840 F.2d 691, 695 (9th Cir.1988).

The Administrative Consent Order issued by EPA on February 7, 1990, required that BACC include in its RAW I a "plan for maintaining security at the site during the removal action, including but not limited to, posting of hazardous waste notification signs, keeping fence gates locked during hours of non-operation and continuing 24 hour surveillance to ensure public access is restricted."

Defendants argue that site security costs incurred prior to the time the Administrative Consent Order went into effect are not response costs.

The evidence at trial indicates that the security costs in question began in August 1988 after the testing by Woodward Clyde indicated that some barrels had been buried at the Site. After BACC reported its findings, EPA advised BACC to continue the 24-hour guard service. The security provision was then made a part of the Administrative Consent Order. Defendants argue that BACC's primary reason for employing the guard service was in reaction to incidents of vandalism that had occurred at the Site. Given the uncertainty regarding the materials that may have leaked from the barrels and the direction given by EPA, the court finds that the security measures taken by BACC were reasonable under the circumstances.

The court concludes that BACC's costs related to security constitute reasonable and necessary costs of response.

### f. Attorney Fees and Expenses

After the close of evidence in this case, the United States Supreme Court ruled on the treatment of attorney fees as CERCLA response costs. *See Key Tronic Corp. v. United States*, —— U.S. ——, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). Resolving a conflict among the circuits, the Court held that litigation related attorney fees and fees related to negotiations with EPA do not constitute recoverable response costs. *Id.* at —— – ——, at 1967–68. The Court held, however, that attorney fees that are "closely tied to the actual cleanup," including fees related to identifying other potentially responsible parties (PRPs), may constitute a necessary cost of response under the terms of § 107(a)(4)(B). *Id.* at ——, at 1967.

At the time of trial, plaintiffs presented their evidence based on controlling Tenth Circuit precedent which made no allowance for recovery of costs associated with identifying PRPs. *See FMC Corp. v. Aero Industries, Inc.*, 998 F.2d 842 (10th Cir.1993). Because *Key Tronic* represented a significant change in the controlling law, the court granted plaintiffs' motion to reopen the evi-

dentiary record to permit plaintiffs to present evidence of attorney fees related to identifying PRPs. An evidentiary hearing for this purpose was held on September 22, 1994.

In addition to including fees related to PRP searches within the scope of response costs, the *Key Tronic* Court also held that fees related to negotiations with the EPA were not to be included as response costs. —— U.S. at ——, 114 S.Ct. at 1968. Negotiation fees were not directly related to litigation and therefore the evidence of such fees was not excluded at trial under the Tenth Circuit precedent. Consequently, the evidence presented at trial and the original amount claimed by BACC included such fees. BACC originally claimed attorney fee response costs paid to the law firm Lewis, Rice & Fingersh [7] in the amount of $290,158.75.[8]

After trial, the parties presented to the court additional briefing to identify those fees initially claimed which related to EPA negotiations.[9] The court accepts BACC's identification of fees relating to EPA negotiations as well as those fees identified by defendants for services rendered through February 7, 1990. Fees totalling $49,067.50 are related to negotiations with EPA. These fees have been subtracted from the amount originally claimed as response costs by BACC and are reflected in Appendix B, BACC Attorney Fee Response Costs Summary, Column 5.

BACC claims that the remainder of the fees originally claimed as CERCLA response costs are attorney fees which were directly related to the cleanup. These fees represent costs associated with designing the removal action, determining technical cleanup requirements to be contained in the work plan, negotiating contracts with environmental service providers, preparing and carrying out the work plans approved by EPA, and monitoring work progress.

The court concludes that not all the fees which BACC claims as relating to the cleanup are recoverable CERCLA response costs. The court has reviewed the Lewis, Rice & Fingersh invoices paid by BACC and has identified fees totalling $53,140.75 which were included in the amounts claimed as response costs but which were not directly related to the cleanup. Such fees are identified in Appendix A, BACC Attorney Fee Response Costs Adjustments, and are summarized in Appendix B, Column 6.

Finally, BACC asserts that additional fees, totalling $71,065.00, were associated with identifying other PRPs. Within the original invoices admitted during trial, Exhibits 136 and 137, BACC has identified what it claims are fees related to identifying other PRPs. These fees total $3,882.50.[10] A second group of invoices was admitted into evidence when the court reopened the evidence after the *Key Tronic* decision. According to the testimony presented in connection with the second set of invoices, BACC is seeking to recover as response costs an additional $64,054.75 in fees, and an additional amount in expenses, that it claims are related to searching for and identifying other PRPs.[11]

The court finds that none of the fees sought by BACC in connection with identify-

---

7. BACC paid a portion of the fees to a predecessor firm, Brown, Koralchik & Fingersh. *See* Exh. 136.

8. *See* Exh. 135. This exhibit summarizes the attorney fees claimed. The total shown on Exhibit 135 is $291,158.75, but this total reflects an arithmetic error and the correct total is $290,158.75. In its Supplemental Proposed Findings filed April 8, 1994 (Doc. 753), BACC contends that the claimed attorney fees total $291,034.25. The court has reviewed the invoices and determined that the amount originally claimed by BACC totals $290,158.75.

9. *See* Supplemental Proposed Findings of Fact and Conclusions of Law Related to *Key Tronic Corp. v. United States,* filed by Trinity and Mosher on June 27, 1994 (Doc. 764), and Memorandum of Law Regarding the Effect of the *Key Tronic* Case on Response Costs Sought by Bancamerica Commercial Corporation and Asarco, Incorporated, filed on June 28, 1994 (Doc. 767), by BACC and ASARCO.

10. *See* BACC's Mem. of Law Regarding the Effect of the *Key Tronic* Case (Doc. 767).

11. *See* Testimony of Jan Harris Aniel on September 22, 1994, transcript p. 35–41. This testimony indicates that the total additional fees sought by BACC total $64,054.75. The summary exhibits admitted along with the invoices, however, indicate that the total fees sought are $71,065.00. The court is unable to explain this discrepancy, but it does not affect the outcome.

ing other PRPs are recoverable response costs in this case.

■ Those costs which BACC attributes to searching for and identifying Trinity and Mosher as PRPs are for work that was apparently performed beginning May 1991, more that six months after BACC brought suit against Trinity and Mosher, through December 1993, just one month before the beginning of the trial. No search was required to identify Trinity and Mosher as PRPs in this case. Trinity was the most recent lessee of the Site, and BACC continued to have contact with Trinity after the termination of the lease. As early as January 1989, BACC sent Trinity a demand letter seeking to recover costs related to environmental problems at the Site.[12] In addition, the EPA had also identified Trinity and Mosher as PRPs as early as 1989. As a result, counsel for Trinity and Mosher participated, along with counsel for BACC and ASARCO, in negotiations with the EPA regarding the Site.[13] Finally, in September 1990, BACC brought suit against Trinity and Mosher in which BACC alleged that Trinity and Mosher were PRPs at the Site. The court finds that PRP search and identification costs, as contemplated by the *Key Tronic* decision, does not include fees incurred after BACC had already filed suit against Trinity and Mosher.

BACC contends that these fees are recoverable because, while BACC knew at the time this suit was filed that Trinity and Mosher could be liable parties, the *extent* of their liability was not known. BACC claims that their response costs should include identification of the nature and extent of the contaminants Trinity and Mosher used in their operations. This effort included attempts to locate other parties, such as suppliers of paint to Trinity and Mosher, who could be named as potential generators. BACC contends that it did not learn that Trinity and Mosher used lead-based paint at the Site until shortly before trial.

Such a broad interpretation of PRP search and identification would eviscerate the Supreme Court's holding in *Key Tronic* that litigation related fees are not response costs. Much of litigation consists of discovery, and much of discovery is focused on the effort to determine the extent of a party's liability and evidence relating to that liability. Under BACC's interpretation of PRP identification, litigation fees related to this effort would be recoverable CERCLA response costs.

Further, such a broad interpretation is not consistent with the Court's holding in *Key Tronic.* The plaintiff in *Key Tronic* sought to recover against the Air Force $1.2 million for response costs which included attorney fees. *Key Tronic,* —— U.S. at ——, 114 S.Ct. at 1963. Part of the attorney fees sought were related to identification of other PRPs, including the Air Force, that were liable for the cleanup. *Id.* The PRP search occurred before Key Tronic entered into a consent decree with the EPA. In upholding the district court's finding that these fees were recoverable response costs, the Court noted "the role Key Tronic's search for other responsible parties played in uncovering the Air Force's disposal of wastes at the site and in prompting the EPA to initiate its enforcement action against the Air Force. Tracking down other responsible solvent polluters increases the probability that a cleanup will be effective and get paid for. Key Tronic is therefore quite right to claim that such efforts significantly benefitted the entire cleanup effort and served a statutory purposes apart from the reallocation of costs." *Id.* at ——, 114 S.Ct. at 1967. In this case, tracing the types of contaminants used by defendants at the Site or determining how much lead paint defendants purchased did nothing to benefit the cleanup effort. Such information regarding the extent of liability serves only the purpose of reallocating costs.

For these reasons, the court finds that the attorney fees identified by BACC as relating to identifying Trinity and Mosher as PRPs constitute litigation related fees and are not recoverable CERCLA response costs.

■ BACC also claims that fees attributable to searching for other parties constitute CERCLA response costs. The other potential PRPs which BACC has identified are ASARCO, KCSS I, the Estate of John Harrow, insurance carriers, the United States,

---

12. *See* Exh. 15, 16.

13. *See* Exh. 22, 37, 73, 198.

and the Santa Fe Railroad. With the exception of ASARCO, none of these parties directly contributed to the cleanup effort, and there is no evidence that the costs incurred to identify the potential liability or solvency of these parties "significantly benefitted the entire cleanup effort" or "served a statutory purpose apart from the reallocation of costs." *Key Tronic,* —— U.S. at ——, 114 S.Ct. at 1967.

 With regard to ASARCO, BACC seeks recovery of fees that were incurred between October 1990 and March 1992. The evidence shows, however, that ASARCO began negotiating with the EPA as a PRP as early as 1989. ASARCO was brought into this lawsuit in December 1990 and by March 1992 ASARCO was on the verge of settling with BACC. The fees claimed by BACC are related to determining the extent of ASARCO's liability rather than identifying ASARCO as a PRP. As a result, the court determines that the attorney fees are not recoverable response costs.

 The final type of cost falling within the category of attorney fees is expenses. Expenses are included on each invoice, but it is not possible to specifically identify which expenses relate to site cleanup activities. For this reason, BACC proposes treating a portion of the expenses from each invoice as response costs. The portion is calculated by dividing the fees determined to be response costs by the total fees shown on the particular invoice, and then multiplying the total expenses by that percentage. The result constitutes the expenses determined to be response costs. The court finds that this is a reasonable method for determining the amount of expenses to be treated as response costs.

Before performing this calculation, the court deducted from total expenses on each invoice those expenses that are not response costs, either because they are litigation expenses or otherwise not reasonable. These expenses are summarized on Appendix A. After these expenses were deducted, the calculation described above was performed, and the results are included in Appendix B. The court concludes that expenses totalling $7,266.82 are CERCLA response costs.

As shown in Appendix B, the court determines that $195,217.32 in attorney fees and expenses incurred by BACC are CERCLA response costs.

### g. EPA Oversight Costs

BACC incurred $37,672.07 in oversight costs, representing charges by EPA. BACC paid this amount to EPA in April 1990, and claims that this expenditure is recoverable as a necessary response cost.

The Administrative Consent Order provides that BACC will pay all response costs that the EPA incurred in connection with the Site. The order further states that EPA, concurrent with the entry of the order, would submit to BACC a summary of all response costs incurred by EPA as of that date. EPA submitted to BACC an invoice dated March 21, 1990, which represented all costs incurred by EPA through December 31, 1989. The invoice categorized the total cost as follows: "salary and benefits" ($6,227.60); "contracts" ($20,159.47); and "indirect" ($11,285.00).

The Administrative Consent Order also provides that at the conclusion of the work to be performed by BACC, EPA would submit to BACC a summary of all *oversight* costs incurred by EPA in connection with the Site. These oversight costs were described as including time and travel costs of EPA personnel, contractor costs, compliance monitoring, inspection of response activities, and review of reports. The order requires BACC to reimburse the EPA for these oversight costs.

The distinction between response costs incurred by EPA and EPA oversight costs is an important one. In *United States v. Rohm and Haas Co.,* 2 F.3d 1265 (3d Cir.1993), the defendant company had entered into an administrative consent order with EPA under which the company agreed to perform various cleanup related activities. The government then brought suit under CERCLA § 107 to recover from the defendant all costs incurred by the government in connection with the site, and seeking a declaratory judgment that all future costs incurred at the site would be recoverable. The court held, under the authority of *National Cable Television Ass'n, Inc. v. United States,* 415 U.S. 336, 342, 94 S.Ct. 1146, 1149–50, 39 L.Ed.2d 370 (1974) and *Skinner v. Mid–America Pipeline*

*Co.,* 490 U.S. 212, 224, 109 S.Ct. 1726, 1733–34, 104 L.Ed.2d 250 (1989), that oversight costs could not be recovered by the government under CERCLA because the statute contained no language indicating clear congressional intent to make such costs recoverable. *Rohm and Haas,* 2 F.3d at 1278.

After noting that "response costs" consist of both "removal" and "remedial" costs under CERCLA, the court went on to explain the statutory distinction between recoverable and non-recoverable costs:

> Where the government takes direct action to investigate, evaluate, or monitor a release, threat of release, or a danger posed by such a problem, the activity is a "removal" and its costs are recoverable. ...
> [I]f the activity is intended to enable EPA to formulate a position on what would be the most appropriate response action at a given facility, the cost is recoverable.... On the other hand, if what the government is monitoring is not the release or hazard itself, but rather the performance of a private party, the costs involved are nonrecoverable oversight costs. Costs of this type would include the costs of contractors hired by EPA to review the plans and work of a private party or its agents executing a response action. Because orders under CERCLA § 106 ... generally involve private removal and remedial activity rather than government removal and remedial activity, costs incurred by the government in connection with administering such orders normally will not be recoverable removal costs.

*Id.,* at 1278–79 (citations omitted).

 Thus, costs which represent the government's direct action in monitoring and remedying a release of hazardous substances may be considered response costs under CERCLA. *See also United States v. Hardage,* 750 F.Supp. 1460, 1498–99 (W.D.Okla. 1990), *aff'd,* 982 F.2d 1436 (10th Cir.1992),

cert. denied sub nom. Advance Chemical Co. v. United States, —— U.S. ——, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993). On the other hand, oversight costs incurred by EPA in monitoring and reviewing the work of others are not recoverable response costs. In this case, the timing of the bill submitted by EPA, shortly after the entry of the Administrative Consent Order, indicates that these charges may represent response costs incurred in directly monitoring the problems at the Site. BACC, however, has consistently referred to these charges as "oversight costs." Further, the record contains no evidence regarding the type of work actually performed by EPA in generating these charges. For these reasons, the court concludes that the $37,672.07 paid by BACC to EPA is not a recoverable response cost.

### 2. ASARCO's Response Costs

#### a. Lead Removal

ASARCO's costs associated with lead removal were all paid to Hydrometrics. The costs incurred totalled $3,085,928.37.[14]

Defendants contend that Hydrometrics costs totalling $460,617.48 which are attributable to building demolition activity are not necessary costs of response. Defendants argue that building demolition was performed primarily to make the Site more attractive and marketable, and was not required under the 106 Order.

The 106 Order modification requires a modified work plan (RAW II) to include a "plan to decontaminate, demolish and dispose of buildings, concrete and asphalt pads, overhead crane structures and railroad track and ties that will be removed from the site during this removal action." Defendants interpret this as not requiring demolition, but rather specifying the action required in the event that the buildings were removed.

---

**14.** Exhibit 211 is a summary showing actual amounts, which totalled $2,887,868.73, that ASARCO paid to Hydrometrics through February 9, 1994. The testimony by ASARCO representative Donald A. Robbins (Robbins, 1947:20–1949:20), along with the reconciliation contained in Exhibit 211, indicate that Hydrometrics was due an additional $171,699.94 for work already performed. This would bring the total due as of February 9, 1994, to $3,059,568.67. The Hydrometrics invoices, however, show total costs of $3,058,932.51, and the court has used this lower amount. In addition to these costs, Hydrometrics also billed ASARCO for $26,995.86 in a final invoice admitted as Exhibit 216. Thus, Hydrometrics costs incurred by ASARCO total $3,085,928.37.

Thomas Wing, Hydrometrics' project manager, testified regarding the building demolition and the court finds his testimony to be credible. Mr. Wing testified that the initial position of BACC and ASARCO was that all the buildings would not be taken down. During 1993, however, EPA and the city of Kansas City informed them that the soil under the buildings would have to be addressed at some point, and if the soil was left in place, BACC and ASARCO would be liable for that work at some time in the future. According to Mr. Wing, if the soil beneath the buildings was not addressed, EPA and the city would provide only a conditional release at the completion of the work, and deed restrictions would be imposed on the property. As a result, the parties would be required to later return to the Site to perform further remedial work. After the buildings were demolished, the soil was left in place, clean soil was imported as cover, and the remaining concrete was broken up to provide drainage. Finally, Mr. Wing testified that one consideration in deciding to demolish the buildings was that the marketability of the Site would be improved.

■ The inquiry as to whether response costs are "necessary" under CERCLA is closely tied to concepts of causation. A party seeking recovery of response costs must show that costs were incurred as a result of a release or threatened release as opposed to, for example, business reasons. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 770 F.Supp. 41, 42–43 (D.Mass.1991), *aff'd,* 972 F.2d 453 (1st Cir.1992). In *Dedham Water,* the district court held that plaintiff's decision to build a water treatment plant was based on pre-existing business reasons rather than in response to a threatened release of hazardous substances, and so the causation element could not be met. *Id.; cf. G.J. Leasing Co., Inc. v. Union Elec. Co.,* 854 F.Supp. 539, 561–62 (S.D.Ill.1994) (holding that cleanup costs were not "necessary" under CERCLA because actions were taken for business reasons rather than for responding

to public health threat), *aff'd,* 54 F.3d 379 (7th Cir.1995).

■ While the building demolition undoubtedly resulted in some enhancement of the property's value, this was not the sole reason for taking the action. EPA had valid concerns regarding possible contamination of the soils underneath the buildings. The evidence suggests that in order to properly complete the cleanup ASARCO was required to remove the buildings and address the underlying soils. This work was performed in a reasonable manner, and under the circumstances it constitutes a necessary cost of response.

The court concludes that the cost of building demolition is a reasonable and necessary cost of response, and that the total costs incurred by ASARCO related to lead remediation are recoverable under CERCLA.

#### b. Attorney Fees

ASARCO claims that $24,410.10 in attorney fees paid to the law firm Swidler & Berlin in 1989 and 1990 constitute recoverable response costs. ASARCO contends that these fees represent work related to searching for PRPs, reviewing site technical cleanup issues, consulting with EPA regarding drafts of EPA work orders, and reviewing technical issues with consultants. ASARCO also claims that $72,026.55 in fees paid to the firm Bradley, Campbell, Carney & Madsen constitute response costs related to implementing EPA's 106 Order. According to ASARCO, these fees represent work related to determining cleanup steps, complying with the Order, reviewing technical matters related to the Site, meeting with EPA regarding required cleanup actions, and negotiating work plans. This work also includes time spent meeting with the city of Kansas City, Kansas, and EPA regarding the scope and extent of the EPA-required cleanup, including building demolition work.[15]

---

15. Invoices related to these attorney fees are found in Exhibit 34. The amounts claimed as response costs have been reduced to exclude work related to negotiating with the EPA. *See* Mem. of Law Regarding the Effect of the *Key Tronic* Case on Response Costs (Doc. 767) filed by BACC and ASARCO on June 28, 1994 and Supplemental Legal Memorandum and Proposed Conclusions of Law and Findings of Fact (Doc. 784) filed by BACC and ASARCO on October 7, 1994.

The court finds that none of the fees incurred by ASARCO for the services of the law firm Swidler & Berlin are reasonable and necessary costs of response. The amounts claimed are for services rendered from May 1989 through December 1990. During this period, ASARCO was not engaged in any cleanup activities at the Site. The *Key Tronic* Court held that "some lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself under the terms of § 107(a)(4)(B)." —— U.S. at ——, 114 S.Ct. at 1967. ASARCO, however, did not become involved in the cleanup activities until December 1991 when the EPA issued its 106 Order.

After reviewing the relevant Swidler & Berlin invoices and the testimony of expert witness Frank S. Craig, the court finds that the fees ASARCO seeks to have included as response costs were primarily incurred in either negotiating an administrative consent order which was never entered or in activities related to litigation. In addition, most of the entries on the invoices do not adequately describe the work being performed. The court concludes that ASARCO has not carried its burden of establishing that the Swidler & Berlin fees were for work which was closely related to the Site cleanup. As a result, none of the Swidler & Berlin fees are recoverable response costs.

Only a portion of the attorney fees claimed by ASARCO for the services of the law firm Bradley, Campbell, Carney & Madsen are reasonable and necessary costs of response. The court has excluded certain fees claimed by ASARCO because they were related to time spent negotiating with the EPA. Additional fees have been excluded because they were related to litigation or otherwise were not necessary costs of response. The fees that have been excluded are summarized at Appendix C, ASARCO Attorney Fee Response Costs Adjustments. The excluded fees total $23,175.50. After deducting these fees from the amount claimed by ASARCO as being directly related to the cleanup, the court finds that $48,851.05 in fees paid by ASARCO to the Bradley, Campbell law firm are reasonable and necessary costs of response.

In addition to the attorney fees discussed above, ASARCO claims that attorney and consultant fees related to searching for and identifying other PRPs constitute recoverable response costs. This work included searching for successors to deceased PRP John S. Harrow, researching activities of the United States government at the Site during World War II, researching railroad activities at the Site, and identifying assets of individual officers and directors of KCSS II, including available insurance coverage for site cleanup costs.

Fees totalling $47,733.90 related to PRP searches were paid to the firm Bradley, Campbell, Carney & Madsen. ASARCO paid an additional $29,332.34 to consultants whose work consisted primarily of searching old records in federal and other archives for site activities engaged in by the United States during World War II, and the Santa Fe railroad in the late 1800s and during this century. For the reasons explained in the section above regarding BACC attorney fees, the court determines that none of the fees claimed by ASARCO as relating to PRP searches are recoverable CERCLA response costs.

Based on the above analysis, the attorney fees paid by ASARCO to be treated as CERCLA response costs total $48,851.05.

### 3. Prejudgment Interest

CERCLA Section 107(a) allows for the recovery of prejudgment interest on recoverable response costs which accrues "from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." 42 U.S.C. § 9607(a)(4). This provision clearly requires a written demand for specified response costs, but courts differ over what form that demand may take. The Fifth Circuit has held that a complaint which did not specify an exact amount constituted a sufficient written demand to trigger the accrual of prejudgment interest. *In re Bell Petroleum Services, Inc.,* 3 F.3d 889, 908 (5th Cir. 1993). Other courts have interpreted the statute as requiring that the written demand include a specific dollar amount. *See State of Colorado v. United States,* 867 F.Supp. 948,

950 (D.Colo.1994); *United States v. Gurley Refining Co.,* 788 F.Supp. 1473, 1485 (E.D.Ark.1992). Applying the plain language of the statute, this court concludes that prejudgment interest does not accrue until written demand for a specific dollar amount is made. Plaintiffs have failed to establish that such a demand was made in this case.

Even if plaintiffs had established their entitlement to prejudgment interest, the record contains no basis for computing such interest, nor have plaintiffs suggested in any of their pleadings or briefs what the amount should be. The interest rate used to calculate prejudgment interest is the same rate as specified for interest on investments of the Hazardous Substance Superfund. 42 U.S.C. § 9607(a). Each year the United States Department of the Treasury determines the interest rate for investments in the Hazardous Substance Superfund. *Hatco Corp. v. W.R. Grace & Co.,* 836 F.Supp. 1049, 1089 (D.N.J.1993). Plaintiffs have presented no evidence establishing the applicable interest rates or the method to compute prejudgment interest.

For these reasons, plaintiffs have failed to meet their burden of proving that they are entitled to prejudgment interest, and, even if entitled, the amount of such interest.

#### 4. *Summary—Response Costs*

Based on the findings outlined above, the court concludes that BACC and ASARCO incurred $1,424,042.47 and $3,134,779.42, respectively, in reasonable and necessary costs of response.

### E. Apportionment and Allocation

Having resolved the basic liability issues and determined the amounts to be treated as CERCLA response costs, the court next focuses on apportionment and allocation. The questions to be resolved are whether defendants are jointly and severally liable along with plaintiffs, and the portion of plaintiffs' response costs for which defendants are responsible. Two distinct concepts are germane to the task of dividing up responsibility for response costs. "Apportionment" relates to the division of liability in the absence of joint and several liability. "Allocation" relates to the division of a judgment among jointly and severally liable parties.

#### 1. *Apportionment of Harm*

CERCLA's legislative history reflects that Congress considered making liability joint and several but deleted that language from the bill. *United States v. Chem–Dyne,* 572 F.Supp. 802, 806 (S.D.Ohio 1983). The deletion "was not intended as a rejection of joint and several liability," but rather "to have the scope of liability determined under common law principles." *Id.* at 808. Courts have held that PRP liability is joint and several if no basis exists for dividing the responsibility for the response costs. *See Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 673 (5th Cir. 1989); *United States v. Monsanto Co.,* 858 F.2d 160, 169–70 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).

The *Chem–Dyne* Court concluded that the issue of whether to apply joint and several liability should be determined by reference to common law, and adopted the approach taken in the Restatement (Second) of Torts. The Restatement provides:

§ 433A. Apportionment of Harm to Causes

(1) Damages for harm are to apportioned among two or more causes where

(a) there are distinct harms, or

(b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes.

§ 881. Distinct or Divisible Harms

If two or more persons, acting independently, tortiously cause distinct harms or a single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused.

Restatement (Second) of Torts §§ 433A, 881 (1979).

Under the *Chem–Dyne* approach, liability may be apportioned only if the defendant demonstrates that the harm is divisible and that there exists a reasonable basis for apportionment. *Chem–Dyne,* 572 F.Supp. at 811. Congress had an opportunity to review this issue when it enacted the Superfund

Amendments and Reauthorization Act (SARA) of 1986. *See* Pub.L. No. 99–499, 100 Stat. 1613. Rather than adding a provision dealing specifically with joint and several liability, Congress explicitly recognized and endorsed the *Chem–Dyne* approach in the legislative history to SARA. *See* H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 74 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2856. Courts, in turn, have interpreted the lack of legislative action on the issue of joint and several liability as an indication that Congress approved of the judicial application of common law tort principles. *See United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1507 (6th Cir.1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990); *O'Neil v. Picillo*, 883 F.2d 176, 179 (1st Cir. 1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990).

In a recent case involving a site where three different companies had operated a chrome-plating shop, the Fifth Circuit rejected a district court's determination that there was no reasonable basis for apportionment. *In re Bell Petroleum Services, Inc.*, 3 F.3d 889, 902 (5th Cir.1993). The district court had required the defendant to prove a certain, rather than a reasonable, basis for apportionment. *Id.* The Fifth Circuit found that defendant's expert testimony on relative volumetric levels satisfied its burden of proving a reasonable basis for apportionment. *Id.* at 903–04.

The Fifth Circuit summarized the apportionment process as follows:

> Essentially, the question whether there is a reasonable basis for apportionment depends on whether there is sufficient evidence from which the court can determine the amount of harm caused by each defendant. If the expert testimony and other evidence establishes a factual basis for making a reasonable estimate that will fairly apportion liability, joint and several liability should not be imposed in the absence of exceptional circumstances. The fact that apportionment may be difficult, because each defendant's exact contribution to the harm cannot be proved to an absolute certainty, or the fact that it will require weighing the evidence and making credibility determinations, are inadequate grounds upon which to impose joint and several liability.

*In re Bell Petroleum Services, Inc.*, 3 F.3d 889, 903 (5th Cir.1993).

In this case, the court finds that Trinity/Mosher Steel is solely liable for the costs related to testing and disposal of hazardous substances contained in the barrels found at the Site. The evidence, however, does not provide a reasonable basis to apportion liability for the lead contamination.

Trinity/Mosher Steel contends that its contribution to the lead contamination at the Site is divisible from the contamination contributed by other parties, and as a consequence, joint and several liability is not appropriate.[16] According to defendants, the expert testimony establishes that the sources of lead contamination at the Site can be distinguished, and therefore the court should apportion liability for the lead contamination. The expert testimony and evidence in this case establishes that in the top four feet of soil slag accounted for 74% of the lead, smelter ash 16%, and lead paint 10%. In the top two feet of soil, approximately 14% of the lead is from paint.

Liability cannot be apportioned solely on the basis of the volume of lead attributable to lead paint, however, because Trinity and Mosher Steel were not solely responsible for the lead paint at the Site. Defendants' expert, Dr. Alan Zindler, did testify that the older paint at the Site was distinguishable from newer paint that might have been used by Trinity or Mosher Kansas. Although Dr. Zindler concluded that the newer paint accounted for less than 10% of the total lead attributable to paint, he did not precisely define what constituted "newer" paint or when it was used.

Similarly, the lead contributed by defendants cannot be calculated based on the amount of time they operated at the Site or the estimated number of projects they completed in comparison to KCSS I and II.

---

**16.** Trinity and Mosher Steel have never contended that their liability, as to each other, is divisible. As far as liability for CERCLA response costs, Trinity and Mosher Steel are treated as one entity and their liability, as to each other, is joint and several.

Defendants point to evidence showing that during the period 1954 to 1969, KCSS I completed over 200 projects that used lead based paint, but claim that the evidence established that Trinity and Mosher Kansas used lead on only two to four projects. As a consequence, Trinity and Mosher Steel argue that they are responsible for only 1% to 2% of the lead contamination at the Site resulting from lead paint. The court cannot accept this as a reasonable basis for apportionment of liability. Records are admittedly incomplete, but the evidence tends to show that Trinity and Mosher Kansas completed many more than four projects using lead paint at the Site. Any calculation of the projects completed and the amount of lead paint used by Trinity and Mosher Kansas compared to KCSS I and II would be speculative.

The court concludes that even under the *Bell Petroleum* standard, the evidence in this case does not establish a reasonable basis for apportioning liability for the lead contamination at the Site.

### 2. Allocation of Costs

Because of the potentially harsh results of CERCLA's liability scheme, courts responded by recognizing an implied right of contribution under CERCLA. *County Line Investment Co. v. Tinney*, 933 F.2d 1508, 1516 (10th Cir.1991). "Contribution is a statutory or common law right available to those who have paid more than their equitable share of a common liability." *Id.* at 1515.

Congress ratified this effort in the 1986 SARA amendments by amending § 113 to expressly recognize the right of contribution. The amended section directs that "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). "A district court has considerable discretion in apportioning equitable shares of response costs." *FMC Corp. v. Aero Indus., Inc.*, 998 F.2d 842, 846 (10th Cir.1993). "In any given case, 'a court may consider several factors, a few factors, or only one determining factor, ... depending on the totality of the circumstances presented to the court.'" *United States v. Colorado & Eastern R.R. Co.*, 50 F.3d 1530, 1536 (10th Cir.1995) (quoting *Environmental Transp.*

*Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir.1992)).

Court has looked to the 1980 legislative history for guidance as to what equitable factors are relevant. An early version of the House bill that eventually became CERCLA set forth six equitable factors for consideration. These factors are known as the "Gore factors", named after then-Representative Albert Gore who proposed them as an amendment to the bill. These factors are:

(i) The ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

(ii) The amount of the hazardous waste involved;

(iii) The degree of toxicity of the hazardous waste involved;

(iv) The degree of involvement by the parties in the generation, transportation, treatment, storage or disposal of the hazardous waste;

(v) The degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(vi) The degree of cooperation by the parties with federal, state or local officials to prevent any harm to the public health or environment.

*Environmental Transp. Sys., Inc.*, 969 F.2d at 508.

Courts have utilized a number of other equitable factors. *See id.* at 509 ("[T]he Gore factors are neither an exhaustive nor exclusive list."). Following are examples of court decisions identifying other equitable factors that may be relevant in allocating costs: *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192 (2d Cir.1992) (financial resources of parties involved); *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 571 (6th Cir.1991) (status as property owner); *Weyerhaeuser Co. v. Koppers Co.*, 771 F.Supp. 1406, 1420 (D.Md. 1991) (owner's acquiescence in the operator's activities and manner of operation and benefit received from the contaminating activities); *Amoco Oil Co. v. Borden, Inc.*, 889

F.2d 664 (5th Cir.1989) (circumstances of a property's conveyance, including price paid).

In this case, CERCLA response costs attributable to Trinity and Mosher Steel were caused by two sources of contamination or potential contamination: barrels and lead. As discussed earlier, the court finds that Trinity and Mosher Steel are liable for all the response costs associated with the barrels.

Several parties bear responsibility for the lead contamination and cleanup: ASARCO, Trinity and Mosher Steel, KCSS I and II, and possibly others not involved in this suit. For purposes of this litigation, the court need only determine the equitable share of response costs to be allocated to Trinity and Mosher Steel. This share will be determined by applying relevant equitable factors to the acts and omissions of Trinity and Mosher Steel. Plaintiffs have not argued that the equitable share allocated to Trinity and Mosher Steel should be increased by any orphan shares created by responsible parties that were either not a part of this litigation or settled with plaintiff for less than their equitable share. The court agrees with this approach and will allocate response costs for lead removal to Trinity and Mosher Steel based on their own responsibility only.

In allocating these costs, the court will consider the following equitable factors: the approximate volume of total lead at the Site contributed by defendants, and the degree of toxicity of the lead.

■ The parties disagree as to how the volume of lead at the Site should be calculated. Plaintiffs contend that lead in the form of slag is not bioavailable and should not be included in calculating the volume of lead at the Site for purposes of allocating costs based on contribution. According to plaintiffs, only lead in the form of smelter ash and paint is bioavailable. These two substances were found at the Site in approximately equal proportions. While ASARCO is responsible for the smelter ash, defendants and KCSS I and II are responsible for the paint. Plaintiffs argue that because defendants were at the Site most recently and the lead paint they contributed would be closest to the surface and therefore the most toxic and pose the greatest threat to off-site migration, defendants should be responsible for at least 20% of the 50% of lead attributable to paint. Plaintiffs suggest that other equitable factors should work to increase defendant's allocation to 40% of 50%, or 20% of the total costs related to lead.

Defendants argue that total lead should be the basis for any type of volumetric allocation. Defendants point to EPA's guidelines [17] which provide that total lead, and not bioavailability, is the standard by which EPA orders or undertakes a Superfund cleanup. While EPA's § 106 Order in this case did not require that any action be taken with regard to the slag monolith located on the Site, the Order does not otherwise distinguish slag from lead in other forms. Pieces of slag were found in the soil samples that served as the basis for the EPA-mandated remedy, and soils containing slag were placed in the on-site landfill along with soils containing smelter ash and paint.

The court agrees with defendants and finds that total lead should be the basis for the volumetric allocation. There is no evidence that EPA would not have mandated any response action had the lead at the Site been only in the form of slag particles. The evidence also shows that the lead contained in slag may, under certain conditions, be released and could be made bioavailable.

■ For these reasons, the court finds that total lead, and not lead which is bioavailable, should be the basis for making any volumetric allocation. The evidence, however, fails to precisely establish the proportion of lead paint contributed by defendants. While the evidence establishes that the lead from paint at the Site accounted for approximately 10% of the total lead, in the top two feet of soil the proportion of lead from paint was approximately 14%. This is significant because under the EPA requirements at least some of the lead in the top two feet of soil would have been subjected to the stabilization/solidification treatment. The evidence also shows that the Site was used as a structural steel facility from 1907 until 1987 and that lead paint was used at the Site during

17. *See* Exh. 730, Interim Guidance for Establish- ing Lead Clean-Up Levels.

this entire period. Defendants operated at the Site from October 1984 until February 1987. Dr. Alan Zindler, defendants' expert witness, testified that the newer paint of the type that defendants would have used accounted for less than 10% of the total lead contamination attributable to paint. Based on the evidence just cited the court finds that under a strict volumetric approach defendants should be held responsible for approximately 1% of the total lead at the Site.

In addition to allocating costs based solely on volumetric contribution to total lead at the Site, the court also finds that toxicity is an appropriate equitable factor. The Eighth Circuit recently upheld a district court ruling which allocated one-third of response costs to a party that had contributed only 10% of the total volume of pollution. *See Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930 (8th Cir.1995). The court found that the increased allocation was justified because the hazardous substance for which the party was responsible was more toxic than the other contaminants at the site. The court agreed with the district court's conclusion that the presence of the more highly toxic substance influenced the remediation required, thus increasing costs. Finally, the court endorsed the district court's rationale that CERCLA seeks to remedy harm to the environment, and that the more toxic chemical causes greater harm.

■ This court agrees with the reasoning in *Control Data* and finds it equitable to adopt the approach taken in that case. While toxicity of particular substances will most often be a relevant allocation factor in cases involving the presence of different chemical substances at the same location, the court finds that it is also an appropriate factor in this case involving only one hazardous substance which is present in different forms. The evidence in this case clearly shows that lead in the form of paint and smelter ash is far more toxic than the lead found in slag. The presence of the smelter ash and paint no doubt influenced the design of the remediation method and contributed to increased costs. As a result, the court finds it appropriate to make an upward adjustment of response costs allocated to defendants based on the toxicity of lead paint.

Based on the above discussion, the court concludes that it is equitable and reasonable that Trinity and Mosher Steel's allocation should be adjusted to 5% of the response costs related to lead soil remediation incurred by BACC and ASARCO.

■ Finally, plaintiffs incurred attorney fees and security costs related to the barrel removal and lead remediation. The attorney fees incurred by ASARCO were all related to the lead remediation. The court finds it equitable to allocate to Trinity and Mosher Steel the same percentage that was determined to be their equitable allocation of response costs related to the lead soil remediation. Therefore, 5% of ASARCO's attorney fee response costs will be allocated to Trinity and Mosher Steel.

BACC incurred both security guard costs and attorney fees over a period of time when BACC was addressing both the barrel removal and lead remediation problems. It is impossible to accurately distinguish which portion of these costs is related to the barrels and which portion is related to the lead. Therefore, the court will make the allocation based on the percentage of BACC response costs allocated to Trinity and Mosher Steel for the categories of barrel removal and lead remediation. BACC's response costs for these two categories totalled $658,430.13, of which $184,183.12 has been allocated to Trinity and Mosher Steel, based on an allocation of 100% for barrel testing and removal and 5% for lead remediation. Defendants' share is therefore 28%. This percentage will be allocated to Trinity and Mosher Steel for BACC's response costs in the categories of security guard costs and attorney fees.

### 3. Allocating Specific Costs

Based on the foregoing discussion of allocation, the court will allocate those costs previously determined to be reasonable and necessary costs of response under CERCLA.

#### a. Barrel Removal

The CERCLA response costs associated with investigation and removal of barrels were all assumed by BACC and totalled $159,222.75. As the court has determined that defendants are responsible for 100 per-

cent of these costs, the total amount allocated to Trinity and Mosher Steel is $159,222.75.

### b. Security Guards

BACC incurred CERCLA response costs for security guard services in the amount of $570,395.02. As the court has determined that defendants are responsible for 28% of these costs, the total amount allocated to Trinity and Mosher Steel is $159,710.61.

### c. Lead Removal

The court has determined that Trinity and Mosher Steel are responsible for 5% of the CERCLA response costs related to lead soil remediation. BACC's recoverable response costs in this category totalled $499,207.38, and $24,960.37 is therefore allocated to defendants. ASARCO incurred $3,085,928.37 in recoverable response costs related to lead remediation, and $154,296.42 is allocated to defendants.

### d. Attorney Fees

The court has determined that Trinity and Mosher Steel are responsible for 28% of the attorney fee response costs incurred by BACC. BACC's recoverable attorney fees totalled $195,217.32, and $54,660.85 is therefore allocated to defendants. ASARCO incurred $48,851.05 in recoverable attorney fee response costs. Because these costs were directly related to lead removal at the Site, defendants will be allocated 5% of the costs, the same percentage of allocation for lead remediation. As a result, $2,442.55 of the total attorney fee response costs incurred by ASARCO is allocated to defendants.

### F. Summary—CERCLA Liability and Allocation of Costs

Trinity and Mosher Steel are jointly and severally liable under CERCLA, along with ASARCO, for the reasonable and necessary costs of response related to the release of hazardous substances at the Site. The court has found that the recoverable response costs total $1,424,042.47 incurred by BACC and $3,134,779.42 incurred by ASARCO. The court has allocated responsibility for these response costs and determined that the response costs to be allocated to Trinity and Mosher Steel total $555,293.55. Judgment will be entered in favor of BACC and against Trinity and Mosher Steel in the amount of $398,554.58. Judgment will also be entered in favor of ASARCO and against Trinity and Mosher Steel in the amount of $156,738.97.

## II. Indemnification

Both BACC and Trinity claim indemnification from the other party for the costs associated with this cleanup. For the reasons that follow, the court finds that neither party is entitled to indemnification.

CERCLA § 107(e)(1) provides:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1).

Courts have reconciled this seemingly inconsistent text by holding that responsible parties cannot contract away their liability under CERCLA for cleaning up a release, but that they may allocate the ultimate financial burden of that cleanup by agreements among themselves. *See United States v. Hardage,* 985 F.2d 1427, 1433 (10th Cir.1993) ("[A]lthough responsible parties may not altogether *transfer* their CERCLA liability, they have the right to obtain indemnification for that liability.") State law governs the interpretation and construction of the indemnification clauses, *id.* at 1433, n. 2, and the court will therefore apply Kansas contract law.

Trinity's claim for indemnification from BACC is based on two contractual provisions. The first is contained in section 3.01 of the Agreement of Representations, Indemnity and Guaranty dated October 26, 1984, between BACC, Mosher Kansas, and Trinity (Exh. 118). In that provision, BACC agreed to indemnify and hold Mosher Kansas harmless from any loss or liability resulting from:

(b) Any claim on [sic] demand asserted against Mosher [Kansas] in which it is alleged that Mosher [Kansas] is liable as a

transferee or successor to Kansas City Structural Steel Company or BACC;

... and

(d) All liens or claims for lien or other liabilities existing as of the date hereof which are subsequently asserted against any of the assets transferred to Mosher [Kansas] under the Bill of Sale or leased to Mosher [Kansas] under the Lease or against Buyer.

 A contract of indemnity is construed in accordance with the general rules for the construction of contracts. *Bartlett v. Davis Corp.,* 219 Kan. 148, 156, 547 P.2d 800, 807 (1976). The plain and unambiguous language contained within a contract must be given its plain meaning. *Central Security Mut. Ins. Co. v. DePinto,* 235 Kan. 331, 333, 681 P.2d 15, 17 (1984). An unambiguous written contract is interpreted as a matter of law and does not require outside evidence to determine its meaning. *Craig v. Hamilton,* 213 Kan. 665, 667, 518 P.2d 539 (1974).

The court finds the language of this indemnity provision to be plain and unambiguous. BACC's obligations to indemnify Trinity[18] arise only with respect to claims against Trinity based on Trinity's status as a transferee or successor to KCSS II or BACC, and with respect to liens or other claims existing as of October 26, 1984, which are asserted against any of the assets transferred or leased to Trinity.

Trinity's CERCLA liability does not fall into either category. Trinity and Mosher Steel are liable under CERCLA based on their status as operator at the Site, and not on their status as transferee or successor to KCSS II or BACC. The fact that Trinity and Mosher Steel's CERCLA liability may be joint and several with BACC does not mean that their CERCLA liability is predicated on their status as transferee. Similarly, the CERCLA liability does not flow from Trinity's status as lessee and is not based on the assets that were transferred or leased to Trinity.

**18.** Trinity is a party to this agreement, as well as the lease agreement discussed later, as the successor of Mosher Kansas.

**19.** This agreement contains a provision deeming it to have been made at Dallas, Texas, and re-

 The second contractual provision on which Trinity bases its indemnity claim is contained in the Agreement and Bill of Sale dated March 1, 1987, between Trinity and BACC (Exh. 832).[19] As part of that agreement, Trinity transferred to BACC "[a]ll of Trinity's right, title and interest in and to that certain Lease Agreement entered into between Trinity and J.A. Tobin Construction Company dated May 1, 1986 ... (hereinafter the "Lease")." The supposed indemnity provision states as follows:

BACC hereby agrees to assume the Lease, perform the obligations of Trinity under the Lease and indemnify and hold Trinity harmless from any loss, liability, claims, damages and expenses, including reasonable attorneys' fees and any out-of-pocket expenses incurred in investigating any claim or demand or defending any litigation to which Trinity is a party, resulting from the Lease.

Trinity's CERCLA liability in this case is completely unrelated to the lease with J.A. Tobin Construction Company, which is more precisely a sublease. Thus, the indemnity language just cited has no bearing on the outcome of this case.

For these reasons, the court finds that Trinity and Mosher Steel have failed to establish that they are entitled to indemnity from BACC for CERCLA liability or damages.

 BACC also claims that it is entitled to indemnity from Trinity for all losses and liability in connection with the Site. BACC's claim is based on two provisions in the Lease Agreement (Exh. 117). These provisions are the following:

2. *Indemnity and Public Liability.* Lessee [Mosher Kansas] covenants at all times to save Lessor [BACC] harmless from all loss, liability, cost or damages that may occur or be claimed with respect to any person or persons, corporation, or property on or about the premises or to

quiring any interpretation to be made in accordance with Texas law. Because the provision of the agreement at issue in this case is clearly unrelated to Trinity's CERCLA liability, there is no need to examine Texas law.

the property itself resulting from any act done or omission by or through the Lessee, its agents, employees, invitees, or any person on the premises by reason of the Lessee's use or occupancy or resulting from Lessee's non-use, or possession of said property and any and all loss, cost, liability, or expense resulting therefrom . . .

9. *Public Requirements.* Lessee shall comply with all laws, orders, ordinances and other public requirements now or hereafter affecting the premises or the use thereof, and save Lessor harmless from expense or damage resulting from failure to do so.

BACC contends that these provisions entitle it to be indemnified by Trinity for all costs BACC incurred related to the lead cleanup and barrel removal. The plain language of these provisions, however, does not support such a broad interpretation. These provisions indemnify BACC only for losses related to Trinity's own acts, omissions, or use of the property. The court has awarded BACC damages under CERCLA for the costs it incurred in the lead cleanup and barrel removal which can be attributed to Trinity's actions. To allow additional recovery based on the indemnity provisions contained in the lease would amount to double recovery.

■ BACC also argues that the indemnity provisions entitle it to recover from Trinity the amounts BACC paid to EPA as oversight costs. The court has determined that these costs are not recoverable under CERCLA. Nevertheless, BACC has not established that the EPA oversight costs were incurred as a result of Trinity's acts, omissions, or use of the property. The lead contamination at the Site was present long before Trinity entered into possession of the property. Even though Trinity may have contributed to the contamination, there is no evidence that the EPA costs would not have been incurred as part of the cleanup process even if Trinity had never leased the Site.

For these reasons, the court finds that BACC is not entitled to indemnification from Trinity under the provisions in the Lease Agreement.

## III. Breach of Contract

BACC claims that it is entitled to additional recovery because Trinity breached various provisions of the Lease Agreement dated October 26, 1984. The court finds the Lease Agreement to be unambiguous and therefore will interpret the applicable provisions without resort to parole evidence. BACC's claims will be discussed separately.

### A. Condition of Premises

Section 4 of the Lease Agreement provides as follows:

4. *Acceptance, Maintenance, and Repair.* Lessee has inspected and knows the condition of the premises and accepts the same in their present condition.

Lessee shall take good care of the premises and the equipment and fixtures therein and shall keep the same in the same working order and condition as on the date hereof, reasonable wear and tear excepted. . . . At the expiration of the term, Lessee shall surrender the premises in as good condition as Lessee received same from Lessor, reasonable wear and tear excepted. All damage or injury to the premises not caused by fire or other casualty shall be promptly repaired by the Lessee.

BACC contends that Trinity's use of lead-based paint and its abandonment of barrels containing hazardous material at the Site breached this lease provision. As explained earlier, Trinity's liability for costs related to lead cleanup has already been included in the determination of its liability under CERCLA and the corresponding allocation of response costs. Nothing in the language of this provision imposes liability upon Trinity for lead contamination already present at the Site at the commencement of the lease term.

■ Further, the lease provision excepts "reasonable wear and tear" from the damages for which Trinity is responsible. In construing a contract, the court must consider the subject matter, the sense in which parties naturally understood it at the time it was made, and the purposes and objects to be accomplished by the agreement. *First Nat'l Bank & Trust Co. v. Lygrisse*, 231 Kan.

595, 600, 647 P.2d 1268, 1272 (1982). BACC acknowledges that the property was leased for the purpose of operating a structural steel fabrication plant, the same purpose for which the property was used for almost all the preceding 77 years. Painting was conducted on the property during this entire period. Construing the lease terms and the intended purpose of the lease, the court finds that lead paint residue left at the Site by Trinity constituted "reasonable wear and tear."

■ Finally, BACC has not proven by a preponderance of the evidence that Trinity left the property in worse condition than when received by abandoning barrels at the Site. The court has found that Trinity and Mosher Steel are liable for the CERCLA response costs related to the testing of barrel contents and removal of associated hazardous wastes. The only barrel-related costs incurred by BACC not allowed as response costs under CERCLA are those related to removal of trash. The evidence does not establish that the cost of trash removal constitutes a damage or injury falling within Section 4 of the Lease Agreement.

The evidence shows that at least some trash barrels were present at the Site during KCSS II's operation. The evidence also shows that Trinity made substantial efforts to clean up the Site and respond to BACC's complaints. In addition, after Trinity returned to complete additional cleanup, BACC's real estate agent, Lou Serrone, told Trinity's employee that the Site appeared to be in good condition. While Mr. Serrone may not have been BACC's agent for all purposes, no other representative of BACC was present to inspect the Site and Trinity was therefore justified in relying on Mr. Serrone's assessment. After that time, BACC made no further complaint to Trinity regarding the condition of the Site until after the environmental audit one year later. Even assuming that Trinity left behind some barrels containing trash, the court concludes that BACC has not established that the premises were in a worse condition when Trinity left than they had been when Trinity first took possession.

■ BACC also argues that Trinity breached this lease provision by operating leaking underground storage tanks and failing to repair them. BACC contends that this breach results in liability to Trinity for the full cost of storage tank removal and the associated soil remediation. Unlike the costs associated with the barrels and lead, the storage tank remediation costs are not recoverable under CERCLA.

The evidence presented at trial does not establish that Trinity failed to maintain the storage tanks properly or that the tanks contaminated the Site as a result of improper maintenance, if any, during the term of the lease. The evidence shows that the storage tanks were installed by a prior owner and that Trinity used one of the gasoline storage tanks for a short time after commencing operations at the Site. Even though the evidence establishes that the tanks caused some contamination at the Site, it is by no means clear that this occurred during the period of Trinity's lease. BACC discovered the leaking gasoline over one year after Trinity left the Site. Finally, the fact that Trinity agreed it had inspected and accepted the premises at the beginning of the lease term cannot be interpreted to mean that the storage tanks were in good working order at that time. In summary, the evidence fails to establish that Trinity breached section 4 of the lease.

### B. Diminution in Value

Section 7 of the Lease Agreement provides that "Lessee shall not make any substantial alterations or additions in or to the premises that will diminish the value of the premises." BACC contends that this provision entitles it to recover for the property's diminution in value. The court finds that BACC has not established that Trinity breached this lease provision.

■ First, there is no evidence that Trinity made substantial alterations or additions related to the Site. Neither Trinity nor Mosher Kansas conducted any construction work at the Site. BACC argues that Trinity buried and abandoned barrels, and contaminated the Site with lead-based paint and petroleum products. The court does not find that this activity constitutes substantial alter-

ation of or addition to the Site as those terms are used in the lease.

 Second, even if Trinity did make substantial alterations or additions at the Site, BACC has not established that Trinity's actions caused a diminution in value. There is no evidence whatsoever of the value of the property at the beginning of the lease term. BACC points to evidence showing that it received offers for the property in the range of $500,000 to $750,000 before the contamination was discovered. These offers were made after the lease was terminated. BACC's appraiser testified that the value of the property after the cleanup is $100,000.

Even if the court were to find the appraisal to be credible and treat the offers as evidence of the property's value, this does not establish that Trinity caused the diminution in value. The value of the property declined because contamination *was discovered.* This property was contaminated with lead before Trinity leased it. Even though Trinity contributed to the contamination during the lease term, there is no evidence that this additional contamination resulted in any further diminution in the property's value. At most, the evidence in the record shows that the property's value declined because contamination was discovered at the Site. This is not sufficient to establish that Trinity caused the diminution in value or even a portion of it.

For these reasons, the court finds that BACC has failed to prove that Trinity breached section 7 of the Lease Agreement.

## C. Property Taxes

The final element of BACC's breach of contract claim is its charge that Trinity failed to pay property taxes for 1986 and 1987.

The Lease Agreement between BACC and Trinity was a "triple net" lease under which Trinity was required to pay all taxes, insurance, and maintenance costs related to the property. Section 25 of the Lease Agreement provides as follows:

> 25. *Taxes.* Lessor shall pay all taxes and assessments on the premises during the term hereof. All such taxes and assessments for the first and last years of the term of this lease shall be prorated between Lessor and Lessee as of the commencement and expiration dates of the term hereof respectively, on a calendar year basis. Lessee shall promptly pay to Lessor its pro-rata share of such taxes and assessments for the years 1984 and 1989 following the presentation to Lessee of evidence of payment of the same by Lessor and the calculation of Lessee's pro-rata share thereof for such years. In addition, Lessee shall promptly pay to Lessor the amount of all such taxes and assessments paid by Lessor for the years 1985, 1986, 1987 and 1988 paid by Lessor upon the presentation to Lessee of evidence of the payment by Lessor of such taxes and assessments....

 BACC paid both 1986 and 1987 taxes in the amounts of $59,466.91 and $64,266.94 respectively, and have not been reimbursed by Trinity. Although the lease provides that Trinity is responsible for all taxes for the year 1987, that was based on the original expiration date of the lease, October 25, 1989. The lease also provides that Trinity is responsible for its pro-rata share of taxes for the year the lease expires. Because BACC and Trinity agreed to cancel the lease effective March 1, 1987, the court finds that the lease must be interpreted to make Trinity responsible for only a pro-rata share of the taxes paid for the year 1987.

 Trinity contends that BACC released any claim against Trinity for property taxes by entering into the Lease Cancellation Agreement dated December 4, 1986 (Exh. 153). Trinity cites a provision of the agreement which states as follows:

> Except for the obligations of the parties under this agreement and the obligations of the parties pursuant to the other transactions entered into on October 26, 1984, each party to the Lease, as to the other party to the Lease, does effective March 1, 1987 hereby remise, release and discharge ... the other party to the Lease from all rights, demands, claims, causes of actions, actions, controversies, debts, accounts, reckonings, covenants, contracts, agreements, promises, judgements, damages, executions, at law or fact, which may be asserted by one party against the other party pursuant to the Lease, *and that* did

not arise from an obligation existing prior to the effective date of cancellation of the Lease.

The underlined words appear as such in the original.

This release clearly does not encompass Trinity's liability for taxes owed under the Lease Agreement as of the date of the lease cancellation. The following provision is also included in the Lease Cancellation Agreement:

> This Agreement does not discharge the parties to the Lease ... from any obligations, duties and responsibilities arising under the Lease through and until the effective date of cancellation of the Lease (or arising thereafter as a result of acts, omissions or conditions in existence prior to such effective date), including, but not limited to, payment of rent and taxes due under the Lease prior to the effective date of cancellation of the Lease, and all such obligations, duties and responsibilities shall remain in effect until duly performed or specifically hereafter released by Banc-America in writing.

These provisions read together clearly indicate Trinity's obligation for payment of accrued property taxes continued past the lease cancellation date, at least with respect to taxes for which Trinity was responsible under the terms of the lease. Trinity is obligated under the lease for all 1986 taxes and a pro rata share of taxes paid for 1987.

■ Trinity also contends that it was entitled to an offset for the amount of the taxes. Trinity's vice-president, F. Dean Phelps, testified by deposition that BACC failed to reimburse Trinity for the overhead cranes which Trinity left at the Site and BACC purchased. BACC's purchase of the cranes was completed on March 1, 1987, when BACC and Trinity entered into an Agreement and Bill of Sale. BACC agreed to pay to Trinity the sum of $200,000.00 on March 1, 1989, or earlier if BACC had sold the Site.

Mr. Phelps' testimony is the only evidence in the record that BACC defaulted in this payment. There is no evidence that Trinity ever gave written notice to BACC that it was in default, as required by the March 1, 1987 agreement. In addition, the agreement provides that if BACC defaulted Trinity could elect to offset any amount due against principal or interest payments on the $910,000.00 note Mosher Kansas issued to Trinity in October 1984 in payment for the assets that BACC transferred to Mosher Kansas at that time. There is no similar right of offset against amounts due to BACC pursuant to the lease agreement. Based on the evidence of record, the court finds that Trinity has not established that BACC failed to fully reimburse Trinity for the sale of the overhead cranes.

For these reasons, the court finds that Trinity has breached the lease agreement by failing to reimburse BACC for property taxes BACC paid for the years 1986 and 1987. Trinity remains liable for the entire amount of 1986 taxes, $59,466.91, and for a prorated share of 1987 taxes. Taxes for 1987 totalled $64,266.94. Because the lease was cancelled effective March 1, 1987, Trinity's prorata share of 1987 taxes is $10,711.16. Trinity's obligation therefore totals $70,178.07.

### D. Attorney Fees

BACC seeks to recover attorney fees incurred for bringing its breach of lease claim. The Lease Agreement provides as follows: "In case it should be necessary for Lessor to bring any action under this lease for the enforcement of any of Lessor's rights hereunder, then Lessee agrees in each and any such case to pay to Lessor, Lessor's reasonable attorneys' fees."

■ Provisions allowing for the recovery of attorney fees in commercial leases are valid and enforceable in Kansas. *Oak Park Inv. Co. v. Lundy's, Inc.*, 6 Kan.App.2d 133, 136, 626 P.2d 1236, 1238 (1981). The court finds that the provision in the Lease Agreement allowing for recovery of attorney fees is enforceable. BACC will be permitted to submit to the court evidence of such attorney fees related to enforcing the lease provision related to the payment of taxes.

Any such claim for attorney fees shall be made by motion, pursuant to Fed.R.Civ.P. 54(d)(2). If a motion for award of attorney fees is made, the following procedure should be used in lieu of D.Kan.Rule 220. Before the court will consider such a motion, the parties are first required to consult. If the

parties reach an agreement, they shall file an appropriate stipulation and request for an order. If they are unable to agree, within 30 days of the filing of the motion under Fed. R.Civ.P. 54(d)(2), the moving party shall file a statement of consultation setting forth the date of consultation, the names of those who participated, and the specific results achieved. The moving party shall also file a memorandum setting forth the factual basis on which the motion for award of attorney fees is based. The memorandum shall be supported by time records, affidavits, or other evidence. Other parties shall have 10 days in which to file a response to the memorandum. Discovery shall not be conducted in connection with motions for awards of attorney fees unless permitted by the court upon motion and for good cause shown.

### E. Summary—Breach of Contract Claims

Judgment will be entered in favor of BACC and against Trinity in the amount of $70,178.07, representing property taxes for which Trinity is responsible under the Lease Agreement. BACC will also be permitted to submit evidence of reasonable attorney fees incurred in connection with enforcing the lease provision related to property taxes. Judgment will be entered in favor of Trinity on all other breach of contract claims asserted by BACC.

### CONCLUSION

Trinity and Mosher Steel are liable under CERCLA, along with ASARCO, for the reasonable and necessary costs of response related to the release of hazardous substances at the Site. The court has found that the recoverable response costs incurred by BACC total $1,424,042.47, and those incurred by ASARCO total $3,134,779.42. Because defendants are the sole source of the contamination related to the barrels left at the Site, the defendants alone are liable for the response costs related to testing and disposal of hazardous substances contained in the barrels.

The evidence does not establish a reasonable basis for apportioning liability for the lead contamination at the Site. The court has applied equitable factors to allocate responsibility for the response costs related to

lead remediation, and determined that Trinity and Mosher Steel shall be allocated five percent of these response costs. Similarly, defendants are allocated five percent of ASARCO's response costs incurred for attorney fees, as those fees were related to lead remediation. BACC also incurred response costs related to security services and attorney fees. Defendants' equitable share of these costs have been calculated based on defendants' share of BACC's combined response costs related to the barrels and to lead remediation. As a result, defendants are allocated 28% of BACC's response costs associated with security services and attorney fees.

Applying these allocation factors, the court concludes that Trinity and Mosher Steel shall be liable for response costs totalling $555,293.55. Judgment shall be entered in favor of BACC and against Trinity and Mosher Steel in the amount of $398,554.58. Judgment shall be entered in favor of ASARCO and against Trinity and Mosher Steel in the amount of $156,738.97.

The claims and counterclaims of BACC and Trinity for indemnification are denied in their entirety.

Judgment shall be entered in favor of Trinity and against BACC on all breach of contract claims asserted by BACC except the claim relating to unpaid property taxes. On that claim, judgment shall be entered in favor of BACC and against Trinity in the amount of $70,178.07, representing property taxes for which Trinity is responsible under the Lease Agreement.

The court further finds that the provision in the Lease Agreement allowing for recovery of attorney fees is enforceable. BACC will be permitted to submit to the court evidence of any such attorney fees related solely to enforcing the lease provision requiring payment of taxes. Any such claim for attorney fees shall be made by motion, pursuant to Fed.R.Civ.P. 54(d)(2) and the procedures described earlier relating to the filing of supplemental documents.

BACC and ASARCO are the prevailing parties and shall be awarded their costs pursuant to Fed.R.Civ.P. 54(d)(1).

IT IS, THEREFORE, BY THE COURT ORDERED that the Clerk of the Court is

directed to enter judgment as provided in this Memorandum and Order.

**IT IS SO ORDERED.**

## APPENDIX A—BACC Attorney Fee Response Costs Adjustments

The following chart summarizes adjustments made to attorney fees claimed by BACC to be CERCLA response costs. The amounts shown in the column labelled "Fees" represent the amounts by which the claimed attorney fees have been reduced. These amounts are also shown in the summary table in Appendix B, in the column labelled "Other amt. not resp."

The amounts shown in the column labelled "Expenses" represent the amounts by which the claimed expenses have been reduced. These amounts are not displayed on the summary table at Appendix B. Instead, in the column labelled "Expenses" in that table the amounts shown are net expenses, i.e., the total expenses shown on each invoice less the adjustment, if any, listed in this chart.

| Invoice Date | Description | Fees | Expenses |
|---|---|---|---|
| 8/16/88 | Work related to asbestos in building, telephone call with broker, and research regarding retroactivity of CERCLA | 312.50 | |
| 9/15/88 | Work related to underground storage tank remediation and asbestos in building; meals | 610.00 | 377.21 |
| 10/19/88 | Work related to asbestos in building; "analyze environmental issues" | 100.00 | |
| 11/28/88 | Work related to underground storage tank remediation; expenses termed "filing fees" and "miscellaneous steel plant investigator" | 150.00 | 205.00 |
| 3/23/89 | Work related to demand letter and computation of damages | 97.50 | |
| 4/24/89 | Expenses related to meals, expert witness fee, and travel | | 1212.43 |
| 5/30/89 | Expense related to service of subpoena | | 86.00 |
| 8/14/89 | Work related to underground storage tank remediation; dining expenses | 140.00 | 172.35 |
| 3/20/90 | Expense for air fare | | 568.00 |
| 4/24/90 | Research related to recovery of cleanup costs; air fare, travel, and meal expenses | 250.00 | 1490.24 |
| 8/14/90 | Meal expense | | 10.00 |
| 10/26/90 | Research into liability for off-site contamination, liability as owner or operator, and CERCLA petroleum exclusion | 550.00 | |
| 11/20/90 | Meal expenses. | | 27.11 |
| 12/6/90 | Meal expenses. | | 66.59 |

| Invoice Date | Description | Fees | Expenses |
|---|---|---|---|
| 1/22/91 | Work performed on 12/13/90 regarding taxes, work performed 12/17/90 reviewing scope of lender liability. Meal expenses. | 773.75 | 85.31 |
| 2/26/91 | Meal expenses. | | 59.17 |
| 3/19/91 | Work performed on 2/18/91 related to preparing position paper for client regarding consent order and conference regarding consent order and administrative law; work performed 2/20/91 regarding strategy for settlement discussions with EPA. Meal expenses and photocopy expenses related to lead paint contamination report (litigation related). | 472.50 | 175.55 |
| 4/10/91 | Not a response cost: work performed on 3/1/91 related to asbestos in building and review of administrative decisions regarding abrogating consent order; work performed 3/5/91 regarding changes to consent order and report on asbestos in building.. Litigation related fees: research done on 3/6/91 related to contribution for cleanup costs; conference on 3/13/91 related to litigation strategy; review of fingerprinting information from expert witness on 3/27/91. Meal expenses. | 2832.50 | 387.29 |
| 6/19/91 | Not a response cost: work related to drafting proposed city ordinance performed on 4/10/91; work performed on 4/13/91 and 5/28/91 related to challenging Administrative Consent Order; conferences on 4/25/91, 5/1/91, 5/10/91, 5/17/91, and 5/23/91 concerning proposed ordinance; work performed on 5/28/91, 5/29/91, and 5/30/91 related to environmental indemnity agreement. Litigation related fees: review of report concerning lead traceability on 4/11/91. Meal expenses. | 3568.75 | 54.77 |
| 7/19/91 | Work related to indemnity agreements performed on 6/3/91; conference with city regarding code violations on 6/26/91; work related to lender liability on 6/29/91. Expense for UCC searches. | 712.50 | 64.00 |
| 8/30/91 | Work related to EPA draft regulations on 7/2/91 and lender liability issue on 7/8/91 and 7/9/91; work related to drafting letter to EPA performed on 7/22/91, 7/24/91, 7/25/91, 7/28/91, 7/29/91, 7/30/91, and 7/31/91. Meal expenses. | 3675.00 | 74.21 |
| 9/20/91 | Not a response cost: work related to underground storage tank removal on 8/6/91; review of lender liability regulations on 8/16/91, 8/20/91, 8/21/91, and 8/22/91; research on 8/19/91, 8/20/91, and 8/21/91 regarding setting aside consent order; work on 8/22/91 related to disputing consent order; drafting letter to EPA on 8/28/91; discussion on 8/30/91 regarding contract defense. Litigation related fees: review of cases regarding contribution on 8/20/91 | 2452.50 | |

1484

| Invoice Date | Description | Fees | Expenses |
|---|---|---|---|
| 11/21/91 | Litigation related fees: discussions on 9/9/91 re-garding ASARCO; discussions with other counsel on 9/13/91; work related to ASARCO on 9/23/91, 10/10/91, 10/16/91, and 10/17/91; conference on 10/2/91 with expert witness; research on 10/21/91 regarding insurance coverage. Not a response cost: discussion on 9/16/91 regarding sale of prop-erty; research and discussions related to lender liability regulation and setting aside consent order on 9/16/91, 9/28/91, 10/14/91, 10/16/91, and 10/30/91; discussions and work regarding subdividing prop-erty on 9/23/91, 10/2/91, 10/3/91, 10/10/91, 10/24/91, 10/28/91, and 10/30/91; contact with city regarding subdivision requirements on 9/25/91 and 10/2/91; research on 10/2/91 regarding liability; work on 10/2/91, 10/7/91, 10/10/91 and 10/15/91 related to deed and legal description for property; drafting letter on 10/16/91 and conferences on 10/17/91, 10/21/91, 10/23/91, 10/24/91, 10/29/91 and 10/30/91 regarding division of parcels from property. Meal and travel expenses. | 4505.00 | 698.63 |
| 12/20/91 | Not a response cost: work related to survey on 11/1/91, 11/14/91, 11/19/91, and 11/20/91; work re-lated to title commitment on 11/19/91, 11/21/91, and 11/26/91; review of EPA documents regarding min-ing sites on 11/1/91; work related to lender liability exclusion on 11/4/91; meeting and conferences on 11/12/91 and 11/13/91 with EPA regarding lender liability rule; discussion on 11/15/91 regarding plat-ting of site Litigation related fees: research relat-ed to ASARCO on 11/9/91; research regarding NCP defense on 11/11/91. Meal expense. | 2067.50 | 14.34 |
| 2/28/92 | Not a response cost: meeting with EPA on 12/5/91 regarding ASARCO documents on off-site liability; work regarding title commitment and deed on 12/10/91, 12/12/91, and 12/13/91; work on 12/19/91 and 12/20/91 regarding subdivision of property; preparation and meeting with EPA and ASARCO on 12/26/91 and 12/30/91 Litigation related fees: telephone calls with counsel for Trinity/Mosher on 12/16/91, 12/17/91, 12/18/91, and 12/23/91; review court order regarding ASARCO on 12/17/91 and 12/24/91; research regarding settling and non-set-tling parties on 12/19/91; conference on 12/20/91 regarding settlement strategy. | 3462.50 | |
| 2/25/92 | Only fees related to the following work constitute response costs: conference on 1/15/92 with client regarding additional work at site; conference on 1/28/92 regarding site clean-up matters. | 2356.25 | |
| 3/17/92 | Only fees related to the following work constitute response costs: review clean-up on 2/20/92; visit to site to review clean-up on 2/22/92; conference with ASARCO technical staff on 2/24/92; review RAW II on 2/25/92 | 3350.00 | 17.46 |

| Invoice Date | Description | Fees | Expenses |
|---|---|---|---|
| 4/20/92 | Not a response cost: work related to platting, plat approval, and survey on 3/3/92, 3/4/92, 3/5/92, 3/6/92, 3/10/92, and 3/30/92; conference on 3/12/92 regarding potential sale of property; work on 3/16/92 related to costs of cleanup. | 1387.50 | |
| 5/26/92 | Litigation related fees: conference on 4/3/92 regarding lead in soil from paint; conferences on 4/14/92 and 4/15/92 regarding lead testing by expert witness; conference on 4/23/92 regarding lead speciation study<br>Not a response cost: review of report challenging EPA's standard for lead soil content on 4/22/92; work on 4/27/92 related to preparing note on plat; work related to plat documents on 4/27/92, 4/29/92, and 4/30/92; conference on 4/29/92 with city regarding platting and future use of site.<br>Meal expense. | 1000.00 | 16.38 |
| 6/18/92 | Not a response cost: work related to survey on 5/7/92; work on 5/11/92 related to lender liability rule and platting; work on 5/27/92 related to platting.<br>Litigation related fees: work on 5/11/92 and 5/13/92 related to lead speciation protocol. | 407.50 | |
| 7/20/92 | Not a response cost: work on 6/2/92, 6/3/92, 6/4/92, 6/5/92, 6/9/92, 6/15/92, 6/19/92, and 6/30/92 related to survey and plat; conference on 6/5/92 regarding settlement with EPA; conferences on 6/9/92, 6/15/92, and 6/19/92 regarding strategy for dealing with EPA; conference on 6/10/92 and 6/11/92 regarding parcelling. | 1220.00 | |
| 9/8/92 | Litigation related fees: conference on 7/22/92 regarding speciation and expert witnesses. Not a response cost: conference on 7/27/92 regarding parceling of lot, sale of building, and speciation study; conference on 7/29/92 regarding title commitment; site visit on 7/30/92 regarding condition of building for sale; work related to plat and survey on 7/16/92, 7/22/92, 7/24/92, 7/28/92, 7/30/92, and 7/31/92. | 1080.00 | |
| 9/25/92 | Litigation related fees: conference on 8/4/92 regarding speciation study and use at trial. Not a response cost: review status of lot split and title insurance on 8/11/92; conference with city regarding weeds on 8/11/92; conferences on 8/26/92 regarding plat and indemnity provisions; work related to plat and survey. | 1755.00 | |
| 10/21/92 | Not a response cost: work related to plat and survey; work on 9/1/92 and 9/2/92 related to EPA standards for lead and conference with expert witness; site visit on 9/5/92 relating to sale plans and potential for keeping building; conference on 9/10/92 regarding sale of building; conference on 9/29/92 related to property sale.<br>Litigation related expenses: blue print reproduction and environmental testing. | 2481.00 | 1312.91 |

| Invoice Date | Description | Fees | Expenses |
|---|---|---|---|
| 12/10/92 | Meal expense | | 18.11 |
| 1/25/93 | Not a response cost: conference regarding indemnity issues and future transfer of property on 12/01/92; discussions, review, and correspondence on 12/2/92, 12/3/92, and 12/4/92 relating to EPA's proposal for modification of order; conference with EPA on 12/10/92 regarding status of lender liability rule; research and discussions on 12/14/92 related to lender liability rule; review proposed contract for building sale and revise terms of settlement agreement on 12/15/92; work related to possible settlement with EPA and KCSS liability and insurance on 12/18/92. Meal expenses. | 3053.00 | 105.68 |
| 2/16/93 | Not a response cost: work on 1/15/93 regarding indemnities and provisions related to underground storage tank areas; conference on 1/26/93 related to indemnities; discussions on 1/27/93 regarding potential waste from fire training station. Meal expenses and expert witness fee. | 420.00 | 724.62 |
| 3/15/93 | Not a response cost: conference on 2/9/93 regarding EPA position with respect to lender liability. | 225.00 | |
| 4/20/93 | Expense related to deposition of expert witness. | | 127.60 |
| 5/11/93 | Not a response cost: discussions on 4/21/93 relating to sale of property; conference on 4/30/93 regarding sales options. | 480.00 | |
| 6/24/93 | Not a response cost: discussion on 5/3/93 regarding sale of property; conference on 5/10/93 relating to site history; work on 5/13/93 regarding sales effort; review on 5/21/93 of economic incentives proposal related to meeting with city; conference on 5/24/93 with potential purchaser at site; conference on 5/25/93 regarding prospective sale of property; conference on 5/26/93 regarding marketing of site for sale; conference call on 5/27/93 with potential purchaser of property. Meal expenses. | 2514.00 | 141.81 |
| 7/23/93 | Not a response cost: work performed on 6/5/93 related to BACC's status under CERCLA; work performed on 6/24/93 related to sale and ASARCO settlement agreement; work performed on 6/26/93 related to terms of settlement agreement. Meal expenses. | 930.00 | 112.59 |
| 8/24/93 | Not a response cost: work performed on 7/1/93 related to sale of property and final settlement with ASARCO; conferences on 7/6/93 and 7/7/93 with prospective buyer and offers to purchase; review of offer on 7/12/93; work on 7/24/93 in preparation for settlement meeting; conferences on 7/27/93 regarding settlement with ASARCO; work performed on 7/28/93 relating to settlement agreement. | 3179.00 | 755.31 |

| Invoice Date | Description | Fees | Expenses |
|---|---|---|---|
| | Travel expenses. | | |
| 10/11/93 | Not a response cost: conference on 9/1/93 related to settlement; review of EPA oversight cases on 9/13/93. | 345.00 | |
| 11/17/93 | Not a response cost: discussion on 10/9/93 relating to settlement and litigation strategy; conference on 10/21/93 regarding potential purchaser for upper parcel. | 225.00 | |

---

## APPENDIX B—BACC Attorney Fee Response Costs Summary

The following chart summarizes the BACC attorney fees determined to be CERCLA response costs. The first two columns show the period during which the services were rendered and the invoice date. The third column, total fees, simply represents the total fees appearing on that particular invoice. The next column shows the amount of those fees originally claimed by BACC to be CERCLA response costs. The fifth column displays the amounts of those claimed fees that were related to EPA negotiations and thus are not recoverable as CERCLA response costs. The sixth column shows additional amounts that have been determined to be not CERCLA response costs. The column titled "Total Resp.Costs (fees)" represents the amount of attorney fees that constitute CERCLA response costs. These amounts are calculated by reducing the original amounts claimed by the amounts related to EPA negotiations and the amounts otherwise not recoverable as response costs (i.e., the preceding two columns).

The "% of total" column simply expresses the ratio of the response costs fees to the total fees on each particular invoice. This figure is used to calculate the amount of expenses that are treated as response costs. The next column shows the total expenses as shown on each invoice less the adjustments described in Appendix A. The column titled "Resp.Costs (expenses)" represents the expense amounts that are treated as CERCLA response costs. These amounts are calculated by multiplying the total expenses by the percentage shown in column 8. The final column in this table is labelled "Total Resp. Costs" and represents the total of response cost fees plus response cost expenses.

| | | | | BACC Attorney Fee Response Costs | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Col. 1 | Col. 2 | Col. 3 | Col. 4 | Col. 5 | Col. 6 | Col. 7 | Col. 8 | Col. 9 | Col. 10 | Col. 11 |
| Services during: | Invoice Date | Total Fees | Original Amt. Claimed | Related to EPA Neg. | Other Amt. not resp. | Total Resp. Costs (fees) | % of Total | Expenses | Resp. Costs (expenses) | Total Resp. Costs |
| 7/88 | 8/16/88 | $5,091.25 | $3,533.75 | $0.00 | $312.50 | $3,221.25 | 63.27% | $162.53 | $102.83 | $3,324.08 |
| 8/88 | 9/15/88 | $4,805.00 | $1,351.25 | $100.00 | $610.00 | $641.25 | 13.35% | $376.78 | $50.28 | $691.53 |
| 9/88 | 10/19/88 | $2,450.00 | $250.00 | $0.00 | $100.00 | $150.00 | 6.12% | $28.30 | $1.73 | $151.73 |
| 10/88 | 11/28/88 | $2,461.25 | $200.00 | $0.00 | $150.00 | $50.00 | 2.03% | $146.07 | $2.97 | $52.97 |
| 11/88 | 12/16/88 | $953.75 | $27.50 | $0.00 | $0.00 | $27.50 | 2.88% | $58.50 | $1.69 | $29.19 |
| 12/88 | 1/24/89 | $2,776.25 | $77.50 | $0.00 | $0.00 | $77.50 | 2.79% | $101.18 | $2.82 | $80.32 |
| 1/89 | 2/23/89 | $2,388.75 | $156.25 | $0.00 | $0.00 | $156.25 | 6.54% | $135.79 | $8.88 | $165.13 |
| 2/89 | 3/23/89 | $7,976.25 | $832.50 | $210.00 | $97.50 | $525.00 | 6.58% | $35.41 | $2.33 | $527.33 |
| 3/89 | 4/24/89 | $5,661.25 | $2,805.00 | $420.00 | $0.00 | $2,385.00 | 42.13% | $11.45 | $4.82 | $2,389.82 |
| 4/89 | 5/30/89 | $7,612.00 | $3,045.00 | $1,995.00 | $0.00 | $1,050.00 | 13.79% | $33.36 | $4.60 | $1,054.60 |
| 5/89 | 6/14/89 | $5,161.25 | $1,505.00 | $210.00 | $0.00 | $1,295.00 | 25.09% | $122.02 | $30.62 | $1,325.62 |
| 6/89 | 7/25/89 | $9,762.50 | $3,045.00 | $140.00 | $0.00 | $2,905.00 | 29.76% | $275.53 | $81.99 | $2,986.99 |
| 7/89 | 8/14/89 | $4,941.25 | $2,345.00 | $0.00 | $140.00 | $2,205.00 | 44.62% | $123.71 | $55.20 | $2,260.20 |
| 8/89 | 9/29/89 | $9,347.50 | $7,512.50 | $7,512.50 | $0.00 | $0.00 | 0.00% | $587.86 | $0.00 | $0.00 |

| | | | | | BACC Attorney Fee Response Costs | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Col. 1 | Col. 2 | Col. 3 | Col. 4 | Col. 5 | Col. 6 | Col. 7 | Col. 8 | Col. 9 | Col. 10 | Col. 11 |
| Services during: | Invoice Date | Total Fees | Original Amt. Claimed | Related to EPA Neg. | Other Amt. not resp. | Total Resp. Costs (fees) | % of Total | Expenses | Resp. Costs (expenses) | Total Resp. Costs |
| 9/89 | 10/31/89 | $11,230.00 | $5,635.00 | $5,635.00 | $0.00 | $0.00 | 0.00% | $163.28 | $0.00 | $0.00 |
| 10/89 | 11/17/89 | $12,106.25 | $6,523.75 | $6,523.75 | $0.00 | $0.00 | 0.00% | $727.47 | $0.00 | $0.00 |
| 11/89 | 12/13/89 | $12,286.25 | $6,251.25 | $6,251.25 | $0.00 | $0.00 | 0.00% | $513.35 | $0.00 | $0.00 |
| 12/89 | 1/25/90 | $10,550.00 | $10,060.00 | $10,060.00 | $0.00 | $0.00 | 0.00% | $659.77 | $0.00 | $0.00 |
| 1/90 | 2/20/90 | $14,215.00 | $9,247.50 | $9,247.50 | $0.00 | $0.00 | 0.00% | $2,500.65 | $0.00 | $0.00 |
| 2/90 | 3/20/90 | $6,561.25 | $2,300.00 | $612.50 | $0.00 | $1,687.50 | 25.72% | $562.58 | $144.69 | $1,832.19 |
| 3/90 | 4/24/90 | $10,261.25 | $1,843.75 | $150.00 | $250.00 | $1,443.75 | 14.07% | $114.72 | $16.14 | $1,459.89 |
| 4/90 | 5/22/90 | $1,470.00 | $375.00 | $0.00 | $0.00 | $375.00 | 25.51% | $8.24 | $2.10 | $377.10 |
| 5–6/90 | 7/16/90 | $3,513.75 | $2,100.00 | $0.00 | $0.00 | $2,100.00 | 59.77% | $53.13 | $31.75 | $2,131.75 |
| 7/90 | 8/14/90 | $7,595.00 | $450.00 | $0.00 | $0.00 | $450.00 | 5.92% | $57.31 | $3.40 | $453.40 |
| 8/90 | 9/17/90 | $3,875.00 | $1,545.00 | $0.00 | $0.00 | $1,545.00 | 39.87% | $41.81 | $16.67 | $1,561.67 |
| 9/90 | 10/26/90 | $8,373.75 | $4,902.50 | $0.00 | $550.00 | $4,352.50 | 51.98% | $136.52 | $70.96 | $4,423.46 |
| 10/90 | 11/20/90 | $12,770.00 | $12,475.00 | $0.00 | $0.00 | $12,475.00 | 97.69% | $257.15 | $251.21 | $12,726.21 |
| 11/90 | 12/6/90 | $12,155.00 | $12,055.00 | $0.00 | $0.00 | $12,055.00 | 99.18% | $484.99 | $481.00 | $12,536.00 |
| 12/90 | 1/22/91 | $10,796.25 | $10,796.25 | $0.00 | $773.75 | $10,022.50 | 92.83% | $588.62 | $546.43 | $10,568.93 |
| 1/91 | 2/26/91 | $13,393.75 | $13,393.75 | $0.00 | $0.00 | $13,393.75 | 100.00% | $729.87 | $729.87 | $14,123.62 |
| 2/91 | 3/19/91 | $11,382.50 | $11,382.50 | $0.00 | $472.50 | $10,910.00 | 95.85% | $196.55 | $188.39 | $11,098.39 |
| 3/91 | 4/10/91 | $12,026.25 | $11,337.50 | $0.00 | $2,832.50 | $8,505.00 | 70.72% | $747.12 | $528.37 | $9,033.37 |
| 4–5/91 | 6/19/91 | $24,347.50 | $23,967.50 | $0.00 | $3,568.75 | $20,398.75 | 83.78% | $884.03 | $740.66 | $21,139.41 |
| 6/91 | 7/19/91 | $3,942.50 | $3,942.50 | $0.00 | $712.50 | $3,230.00 | 81.93% | $104.40 | $85.53 | $3,315.53 |
| 7/91 | 8/30/91 | $7,440.00 | $7,365.00 | $0.00 | $3,675.00 | $3,690.00 | 49.60% | $347.76 | $172.48 | $3,862.48 |
| 8/91 | 9/20/91 | $8,760.00 | $7,906.25 | $0.00 | $2,452.50 | $5,453.75 | 62.26% | $193.98 | $120.77 | $5,574.52 |
| 9–10/91 | 11/21/91 | $17,681.25 | $7,808.75 | $0.00 | $4,505.00 | $3,303.75 | 18.69% | $768.20 | $143.54 | $3,447.29 |
| 11/91 | 12/20/91 | $5,515.00 | $4,542.50 | $0.00 | $2,067.50 | $2,475.00 | 44.88% | $116.70 | $52.37 | $2,527.37 |
| 12/91 | 2/28/92 | $4,588.75 | $4,384.00 | $0.00 | $3,462.50 | $921.50 | 20.08% | $40.14 | $8.06 | $929.56 |
| 1/92 | 2/25/92 | $2,605.00 | $2,605.00 | $0.00 | $2,356.25 | $248.75 | 9.55% | $13.08 | $1.25 | $250.00 |
| 2/92 | 3/17/92 | $3,987.50 | $3,987.50 | $0.00 | $3,350.00 | $637.50 | 15.99% | $35.33 | $5.65 | $643.15 |
| 3/92 | 4/20/92 | $7,898.75 | $5,198.75 | $0.00 | $1,387.50 | $3,811.25 | 48.25% | $266.84 | $128.75 | $3,940.00 |
| 4/92 | 5/26/92 | $3,092.50 | $2,567.50 | $0.00 | $1,000.00 | $1,567.50 | 50.69% | $350.33 | $177.57 | $1,745.07 |
| 5/92 | 6/18/92 | $3,415.00 | $2,118.75 | $0.00 | $407.50 | $1,711.25 | 50.11% | $348.22 | $174.49 | $1,885.74 |
| 6/92 | 7/20/92 | $5,850.00 | $4,815.00 | $0.00 | $1,220.00 | $3,595.00 | 61.45% | $85.49 | $52.54 | $3,647.54 |
| 7/92 | 9/8/92 | $7,522.00 | $4,171.00 | $0.00 | $1,080.00 | $3,091.00 | 41.09% | $105.95 | $43.54 | $3,134.54 |
| 8/92 | 9/25/92 | $11,595.50 | $9,063.00 | $0.00 | $1,755.00 | $7,308.00 | 63.02% | $457.26 | $288.19 | $7,596.19 |
| 9/92 | 10/21/92 | $4,822.50 | $3,712.50 | $0.00 | $2,481.00 | $1,231.50 | 25.54% | $69.71 | $17.80 | $1,249.30 |
| 10/92 | 11/24/92 | $2,341.00 | $1,845.00 | $0.00 | $0.00 | $1,845.00 | 78.81% | $768.86 | $605.96 | $2,450.96 |
| 11/92 | 12/10/92 | $738.50 | $435.00 | $0.00 | $0.00 | $435.00 | 58.90% | $459.71 | $270.78 | $705.78 |
| 12/92 | 1/25/93 | $7,864.00 | $6,148.25 | $0.00 | $3,053.00 | $3,095.25 | 39.36% | $116.19 | $45.73 | $3,140.98 |
| 1/93 | 2/16/93 | $2,726.50 | $2,582.00 | $0.00 | $420.00 | $2,162.00 | 79.30% | $197.27 | $156.43 | $2,318.43 |
| 2/93 | 3/15/93 | $1,933.00 | $1,895.50 | $0.00 | $225.00 | $1,670.50 | 86.42% | $247.05 | $213.50 | $1,884.00 |
| 3/93 | 4/20/93 | $2,177.00 | $1,634.00 | $0.00 | $0.00 | $1,634.00 | 75.06% | $43.50 | $32.65 | $1,666.65 |
| 4/93 | 5/11/93 | $1,711.00 | $1,553.50 | $0.00 | $480.00 | $1,073.50 | 62.74% | $15.08 | $9.46 | $1,082.96 |
| 5/93 | 6/24/93 | $8,525.00 | $7,777.50 | $0.00 | $2,514.00 | $5,263.50 | 61.74% | $43.03 | $26.57 | $5,290.07 |
| 6/93 | 7/23/93 | $9,961.00 | $8,405.50 | $0.00 | $930.00 | $7,475.50 | 75.05% | $127.93 | $96.01 | $7,571.51 |
| 7/93 | 8/24/93 | $8,405.00 | $7,535.00 | $0.00 | $3,179.00 | $4,356.00 | 51.83% | $364.28 | $188.79 | $4,544.79 |
| 9/93 | 10/11/93 | $1,187.00 | $1,146.00 | $0.00 | $345.00 | $801.00 | 67.48% | $55.59 | $37.51 | $838.51 |
| 10/93 | 11/17/93 | $2,956.00 | $1,686.00 | $0.00 | $225.00 | $1,461.00 | 49.42% | $17.17 | $8.49 | $1,469.49 |
| | | $419,538.25 | $290,158.75 | $49,067.50 | $53,140.75 | $187,950.50 | | | $7,266.82 | $195,217.32 |

## APPENDIX C—ASARCO Attorney Fee Response Costs Adjustments

The following chart summarizes adjustments made to attorney fees for the services of the Bradley, Campbell, Carney & Madsen law firm claimed by ASARCO to be CERCLA response costs. The amounts shown in the column labelled "Fees" represent the amounts by which the claimed attorney fees have been reduced.

| Invoice Date | Description | Fees |
|---|---|---|
| 3/27/92 | Work related to EPA negotiations on 2/4/92, 2/5/92, 2/10/92, 2/11/92, 2/12/92, and 2/28/92. | 3,792.00 |
| | Travel to Washington, D.C. for conference at Skadden Arps on 2/17/92 and 2/18/92. | 2,736.00 |
| | Work related to settlement agreement on 2/21/92, 2/22/92, and 2/24/92. | 1,248.00 |
| 4/15/92 | Work related to EPA negotiations on 3/25/92 and 3/26/92. | 1,408.00 |

| Invoice Date | Description | Fees |
|---|---|---|
| 5/19/92 | Work related to EPA negotiations on 4/7/92, 4/8/92, and 4/9/92. | 3,280.00 |
| | Litigation related fees involving lead speciation and expert witness on 4/15/92, 4/16/92, 4/17/92, 4/22/92, and 4/27/92. | 727.00 |
| 6/15/92 | Litigation related fees involving lead speciation study and expert witness on 5/7/92, 5/18/92, 5/27/92, 5/28/92, and 5/29/92. | 1,024.00 |
| 7/17/92 | Litigation related fees involving lead speciation study on 5/30/92, 6/2/92, 6/5/92, 6/8/92, 6/9/92, 6/10/92, 6/19/92, and 6/22/92. | 1,598.00 |
| | Other litigation related fees on 6/11/92, 6/23/92, 6/24/92, and 6/25/92. | 1,502.00 |
| 8/14/92 | Fees related to settlement agreement on 6/29/92, 6/30/92, and 7/1/92. | 800.00 |
| | Litigation related work performed on 6/29/92, 7/1/92, 7/3/92, 7/6/92, 7/7/92, 7/8/92, 7/9/92, 7/10/92, and 7/16/92. | 2,065.00 |
| 9/21/92 | Litigation related fees for work performed on 8/20/92, 8/21/92, and 8/23/92. | 488.00 |
| 11/10/92 | Work related to lead speciation study on 10/16/92, 10/20/92, 10/21/92, and 10/23/92. | 730.00 |
| 11/27/92 | Work related to lead speciation study on 10/26/92, 10/30/92, 11/04/92, 11/9/92, 11/10/92, 11/11/92, and 11/18/92. | 557.00 |
| 1/18/93 | Work related to lead speciation on 12/16/92 and 12/18/92. | 608.00 |
| 3/8/93 | Work related to lead speciation study and expert witness on 2/1/92, 2/8/92, 2/9/92, and 2/12/92. | 612.50 |
| | **Total** | 23,175.50 |